## GROGAN et al. v. THE CITY OF SAN FRANCISCO.

UNDER the Charter of 1851 of the city of San Francisco, an ordinance, to be valid, had to be passed by a majority of the votes of all the Aldermen whom the Charter provided should be elected.

The doctrine held in McCracken v. City of San Francisco, (16 Cal. 591) that the appropriation for municipal purposes of the moneys received from the sales in December, 1853, of the city slip property did not amount to a ratification of the sales, affirmed.

A private proprietor having full power over his own property, may ratify an unauthorized sale of the same made by a person assuming to be his agent, without reference to its mode, whether made publicly or privately. He may, in some instances, be estopped from denying the act of the assumed agent after appropriating its benefits with knowledge of the facts.

So the State may ratify the acts of her agents upon a subject within the constitutional control of the Legislature, when they exceed their powers. She may do this by legislation directly affirming the acts, or by legislation proceeding upon their assumed validity, and for the reason that there is no limitation as to the mode in which the State may give her assent, except that it shall be by an act or resolution of her Legislature.

Not so with a municipal body under restrictions such as are contained in the Charter of 1851 of the city of San Francisco. Her authorities could give their assent to a sale of the city property only in one way, to wit: by an ordinance authorizing a sale at public auction, after due advertisement of the time, place and terms.

Purchasers at the sales of the city slip property in San Francisco, in December,

Grogan *v.* San Francisco.

1853, under alleged Ordinance No. 481, acquired no title or claim of title by their bids and the payment of their money. The city obtained the money without consideration and used it, and is legally bound to refund it, unless some subsequent matter has released her from liability.

Under the Act of April 26th, 1858, entitled "An Act to authorize the Treasurer of the City and County of San Francisco to execute certain deeds and cancel certain claims," and providing that the Treasurer shall receive from purchasers at the sale of the city slip property in December, 1853, any sum remaining unpaid by them respectively for the property sold under Ordinance No. 481, payable in—among other items—"any genuine City Controller's warrants," issued on or after May 1st, 1851, the Treasurer had no authority to receive any Controller's warrants except such as represented a genuine indebtedness of the city. It was not sufficient that the warrants were genuine in the sense that the signatures of the officers attached to them were not forged; but they must have been issued by authority of the city and have been a valid obligation against the city.

Hence, where the Treasurer received in payment of sums remaining unpaid upon the sales of December, 1853, Controller's warrants not representing any legal or equitable indebtedness of the city, and executed a deed under the Act of 1858, which was accepted by the purchaser, the Treasurer acted without authority, and his deed is inoperative to pass any interest in the property; the title remains in the city, and the purchaser may recover from her the money paid upon the alleged sale in December, 1853.

Deeds executed by the Treasurer of the city and county of San Francisco in accordance with the Act of April 26th, 1858, above named, do not pass to the purchasers the title of the city to the slip property sold in December, 1853, under Ordinance No. 481, for the reason that the city has never accepted that act; and without such acceptance the Legislature could not divest the estate of the city acquired by the legislative grant under the Water Lot Act of 1851.

There is no difference, in the inviolability of a contract, between a grant of property to an individual and a like grant to a municipal corporation. So far as municipal corporations are invested with subordinate legislative powers for local purposes, they are mere instrumentalities of the State for the convenient administration of the Government, and their powers are under the entire control of the Legislature; they may be qualified, enlarged, restricted or withdrawn at its discretion. But when they are empowered to take and hold private property for municipal uses, such property is invested with the security of other private rights.

A legislative grant is an executed contract, and as such is within the clause of the Constitution of the United States which prohibits the States from passing any law impairing the obligation of contracts. It cannot therefore be destroyed and the estate be divested by any subsequent legislative enactment. When the State enters into a contract with a municipal corporation, the subordinate relation of the corporation ceases, and that equality arises which exists between all contracting parties. The control of the Legislature over the corporation can be exercised only in subordination to the principle which secures the inviolability of contracts.

*Hart* v. *Burnett*, (15 Cal. 530) and *Payne* v. *Treadwell*, (16 Id. 22) do not conflict with the views here expressed as to the power of the Legislature over the property of a municipal corporation. There.the lands were held by the pueblo, and the city, as its successor, in trust for public municipal purposes, and the trust was subject to the direction, supervision and control of the Government. The cases cited have no application to a case like the present, where the Legislature has undertaken to divest property which is not held upon any such trusts, without the city's previous consent, or the city's subsequent acceptance of its Act.

APPEAL from the Twelfth District.

This is an action to recover the sum of $19,552.74, with interest, for moneys paid by the plaintiffs to the defendant upon bids made by them for lots situated in San Francisco, which were put up for sale by the Mayor and Land Committee of the city under a pretended ordinance of the Common Council. The complaint contains two counts—one setting forth the particulars of the alleged illegal sale, and the other for moneys had and received by the defendant for the use of the plaintiffs. Two answers were filed to the complaint—one in June, 1855, and the other in September, 1859. In the first answer, the defendant, to the allegations of the first count of the complaint, avers, in substance, that the alleged sale was never made by virtue of any ordinance or authority of the city of San Francisco; that the Mayor and Land Committee of the city never had any authority to sell the lots, nor to receive moneys for or on behalf of the city : that the plaintiffs never paid the moneys mentioned in the complaint, or any part of them, to the city, and that the city never accepted nor received the same, or any part of them, from the plaintiffs. To the allegations of the second count of the complaint, the first answer, in substance, denies the receipt of any moneys by the city for the use of the plaintiffs. The first answer also sets up that the city of San Francisco possessed no powers, .except such as were conferred by the charter, and was not authorized to become a depositary of moneys, or in any other way to receive moneys for the use of the plaintiffs, or to contract any indebtedness or incur any liability in the mode set out in the complaint ; and that at the time the indebtedness to the plaintiffs is alleged to have accrued, and long prior thereto, the city was indebted in a sum exceeding $50,000, over and above its annual rev-

enues, exclusive of indebtedness which accrued prior to April 15th, 1851, and in consequence had no power, under the prohibitions of the charter, to create, or to permit to accrue, the indebtedness alleged in the complaint. The second answer is a general denial of the allegations of the complaint.

By stipulation between the parties, an order was entered referring the case to a referee to try all the issues, whether of law or fact, and to report a judgment thereon to the Court.

In his report, the referee finds the following facts:

First—That the defendant is a body politic and corporate, incorporated under the laws of the State of California.

Second—That on the twenty-sixth day of December, 1853, the defendant claimed the several pieces or parcels of land described in the complaint as its property, and on that day the same were offered for sale by defendant, at public auction, by virtue of a supposed or pretended ordinance, purporting to be an ordinance of the city; that the said pieces or parcels of land were conveyed to defendant by the State of California, by an act entitled " An Act to provide for the disposition of certain property of the State of California," passed March 26th, 1851.

Third—That said supposed or pretended ordinance was published by the authorized agents of the defendant as being an ordinance legally passed by the Common Council of the city, and was signed and approved by C. K. Garrison, then Mayor, on the fifth day of December, 1853.

Fourth—That by the ordinance the Mayor and Joint Committee on Land Claims of said city were in terms authorized to sell at public auction, after not less than ten days' advertisement in the daily newspapers of the city, to the highest bidder, at such time and place as they should think proper, the lots described in the complaint.

Fifth—That the agents of the defendant, on the twenty-sixth day of December, 1853, in pursuance of the terms of the ordinance, offered the lots for sale at public auction, and the plaintiffs attended such auction sale, and bid off four of the lots, embraced and included within the land described in the complaint, and in the ordinance, which lots were known at the sale, and are now known,

as lots numbers forty-five, forty-six, forty-seven and forty-eight, respectively; and at the sale the plaintiffs bid the sum of $15,000 for lot number forty-five, the sum of $14,500 for lot number forty-six, the sum of $9,450 for lot number forty-seven, and the sum of $9,450 for lot number forty-eight, which bids amounted in the aggregate to the sum of $48,400, and the several bids were then accepted by the defendant, and the four lots struck off to the plaintiffs.

Sixth—That in consideration of the bids, and the acceptance of the same by the defendant, and thereby the supposed sale of the lots, the plaintiffs paid to the defendant, on account of the bids, the sum of $19,551.74, in installments, as follows: $12,680 on the thirtieth of December, 1853; $5,637.74 on the twenty-seventh of February, 1854; and the sum of $1,234 on the second of May, 1854.

Seventh—That no part of the said sum of $19,551.74 has been paid back to the plaintiffs by the defendant.

Eighth—That said ordinance was passed by the Board of Assistant Aldermen of the city, by a vote of four in favor to three against it; that at the time of its passage there was a vacancy in the Board of Assistant Aldermen, one member thereof having previously resigned, and no person had been elected or qualified in his stead.

Ninth—That shortly after the twenty-sixth of December, 1853, the plaintiffs went into the possession of lots so, as aforesaid, struck off to them, and they, or one of them, have ever since continued in the possession of the same.

Tenth—That the lots have, from time to time, subsequent to the first of January, 1855, been assessed for taxes, and the taxes have been paid by the plaintiffs or by one of them.

Eleventh—That on the fifth of April, 1855, one Kelsey Hazen commenced an action against the defendant upon an implied contract for the recovery of money, payable in this State, for the sum of $7,000; and afterwards, on or about the thirteenth of April, 1855, an attachment was issued in the action, commanding the Sheriff of the county to attach sufficient of the defendant's property to satisfy the sum of $7,000, and on the same day the Sheriff, by virtue of the attachment, seized certain real estate belonging to

the defendant, to wit: the several pieces and parcels of land described in the complaint, and in said ordinance, including the four lots struck off to the plaintiffs; and afterwards, on or about the twelfth day of August, 1855, the action was removed from the Fourth District to the Twelfth District Court, and such proceedings were had that judgment was rendered and docketed therein, in the county of San Francisco, in favor of said Kelsey Hazen and against the defendant, on the fifteenth of December, 1860, for the sum of $11,870.83 damages, and one hundred and twenty-one dollars and seventy-five cents costs and disbursements.

Twelfth—That prior to the first of January, 1856, twenty-six attachments were issued in twenty-six actions now or lately pending in the Twelfth District Court, and two attachments in two actions now or lately pending in the Fourth District Court, which actions were severally commenced upon implied contracts for the direct payment of money, payable in this State, and the several attachments were issued to the Sheriff of the county, and each commanded him to attach sufficient of the defendant's property to satisfy the sums in each of said attachments mentioned, amounting in the aggregate to $441,442.50, and the Sheriff, by virtue of the attachments prior to the day and year last aforesaid, seized all the real estate described in the complaint in this action, including the four lots struck off to the plaintiffs, which several actions, and the amounts mentioned in each of the attachments, are set forth and described in an exhibit annexed to the report.

Thirteenth—That on the seventh of April, 1855, an attachment was issued in this action in favor of the plaintiffs herein and against the defendant, to the Sheriff of the county of San Francisco, commanding him to attach sufficient of the defendant's property to satisfy the sum of $19,552.74, and the Sheriff, under and by virtue of the attachment, seized all of the real estate described in the complaint, and in the ordinance.

Fourteenth—That prior to the twenty-sixth of December, 1853, the Common Council of the city, by an ordinance legally passed and approved, set apart and dedicated to public use, as a free and public dock for ships and other vessels, the pieces and parcels of land described in the complaint, which ordinance has not been repealed.

Fifteenth—That the plaintiff, Alexander B. Grogan, by deed dated March 3d, 1860, for a valuable consideration conveyed to one J. Mora Moss his interest in and to the four lots, which deed was afterwards duly recorded.

Sixteenth—That on the first of March, 1859, the plaintiffs paid to William H. Tillinghast, then Treasurer of the city and county of San Francisco, the residue of the bids made by them and accepted by the defendant, not theretofore paid, and the said William H. Tillinghast on the first of March, 1859, as such Treasurer, executed under the corporate seal of the city and county four instruments in writing, which purport to be deeds executed on behalf of the city and county of San Francisco, and to convey to the plaintiffs the four lots of land so as aforesaid struck off to them at the supposed sale for the sums bid by them therefor, which four instruments in writing were delivered to the plaintiffs; that the payments made to the Treasurer were made in paper purporting to be the indebtedness of the defendant, commonly known as "City Scrip," signed by the Controller of the city of San Francisco; that the said purported indebtedness, or "City Scrip," did not represent any legal or equitable indebtedness of the defendant; that the payment of the purported indebtedness or "City Scrip," so as aforesaid paid to the Treasurer, had been uniformly refused by the defendant, and the two Boards of Examiners, respectively created and appointed under the two following acts of the Legislature, to wit: "An Act to provide for the funding of the Legal and Equitable Debt of the City of San Francisco, and for the final redemption of the same," approved May 7th, 1855, and "An Act to provide for the funding and payment of the Outstanding Unfunded Claims against the City of San Francisco and County of San Francisco, as they existed prior to the first day of July, one thousand eight hundred and fifty-six," approved April 20th, 1858, had rejected and refused to allow or fund the same; that the market value of the purported indebtedness or "City Scrip" was about ten per cent. of its nominal amount, and that the same was received by the Treasurer at its purported par value; that the Treasurer in making the deeds acted under the authority of an act of the Legislature, entitled "An Act to authorize the Treasurer of the City and

Grogan v. San Francisco.

County of San Francisco to execute certain deeds and cancel certain claims," approved April 26th, 1858; that neither the city of San Francisco nor the county of San Francisco have ever accepted the act; that on or about the fifth of January, 1855, the purchasers at the supposed or pretended sale of the lands described in the complaint and in the pretended ordinance became aware of the illegality of the sale, and apprised the then Common Council of the city that the sale was illegal for the reason that the ordinance had not been legally passed, and requested them to pass an ordinance ratifying and confirming the sale, which they refused to do; and neither the city of San Francisco nor her successor—" the city and county of San Francisco "—have ratified or confirmed the sale, or the sale of the lots struck off to the plaintiffs; that neither twenty-five per cent. of the amount paid by the plaintiffs to the Treasurer as aforesaid, nor any part of such payment, have been paid into the State treasury.

Seventeenth—That the said J. Mora Moss, by deed dated on the third of March, 1860, conveyed to the plaintiff, William M. Lent, his interest in the four lots struck off to the plaintiffs, which deed was afterwards recorded.

Eighteenth—That on the trial of this action the plaintiffs tendered to the defendant's attorneys engaged on the trial, four deeds, executed and duly acknowledged by the plaintiff William M. Lent to the defendant, of the four lots struck off to the plaintiffs, for the defendant's use, together with the possession of the four lots, which deeds and possession the defendant's attorneys refused to receive for or on behalf of the defendant, or for the city and county, or for any purpose whatever, whereupon the plaintiffs continued the tender of the deeds and possession, and deposited the deeds with the referce to and for the use of the defendant, and subject to her order or the order of her successor in interest, and on the trial of the action the plaintiffs disclaimed any interest or possession of, in or to the four lots or either of them adverse to the defendant.

And as conclusions of law from the foregoing facts, the referee finds as follows:

1st. That the supposed or pretended ordinance was not legally passed by the Board of Assistant Aldermen, and was and is therefore void.

2d. That the auction sale was void, and the plaintiffs did not and have not received any consideration for the money paid by them to the defendant.

3d. That the judgment recovered by Kelsey Hazen against the defendant is now and has been by relation a lien upon the four lots struck off to the plaintiffs, from the time of the seizure and attachment of the same thereunder in the action in which the judgment was rendered.

4th. That the several attachments mentioned and referred to in the findings of facts are liens upon the lots struck off to the plaintiffs, and that any judgments recovered in said actions will, by relation, be liens upon the lots from the date of seizure and attachment by the Sheriff; and

5th. That the defendant is indebted to the plaintiffs by reason of the premises in the sum of $19,551.74, with interest as follows:— on $12,680, from the thirtieth of December, 1853; on $5,637.74, from February 27th, 1854; and on $1,234, from the second of May, 1854, amounting in all, principal and interest, at the date of the report, to the sum of $33,931.29, for which sum the plaintiffs are entitled to judgment against the defendant, and for their costs and disbursements.

The referee concluded with the report of a judgment for the plaintiffs for the amount found due with costs and disbursements.

To the report the counsel of the city excepted, on the ground that the facts found by the referee and reported by him did not justify the conclusions of law drawn therefrom, and moved for a new trial. The Court directed the judgment reported by the referee to be entered, and denied the motion for a new trial. From the judgment and the order refusing a new trial the defendant appeals.

*J. B. Felton*, for Respondent.

The points made by Respondent in this case are—

I.   That the Act of April 26th, 1858, is void, because it divests the vested rights of the city and county of San Francisco without the assent of said city and county.

II.   That it is void because it impairs the obligation of a con-

tract—the contract entered into between the city of San Francisco and the State of California, by an act entitled "An Act to provide for the disposition of certain property of the State of California," passed March 26th, 1851.

III. That the expression in the Statute of April 26th, 1858, (Statutes 1858, 322) which authorizes the Treasurer of the city and county of San Francisco to receive pay in any genuine city Controller's warrants, applies only to such city Controller's warrants as represent a genuine indebtedness of said city, and to such as were issued by the authority of the city. That said act did not consequently authorize said Treasurer to receive warrants which were genuine only in the fact that they were signed by the Controller, but were void in all the essentials of a genuine warrant— void because they did not represent any legal indebtedness of the city; void because they had not been issued by the authority of the city of San Francisco; and in addition to their legal invalidity, were void morally and equitably, as is shown by the constant refusal of the city and Fund Commissioners to recognize them even as an equitable indebtedness.

The material facts to illustrate these points are as follows:

1st. That the city of San Francisco, prior to the passage of the Act of 1858, was the owner of certain land; that its title to the land was derived from the act known as the Water Lot Act, passed March 26th, 1851; that by said act the city was authorized to sell the said land on condition of paying to the State twenty-five per cent. of all moneys arising from the sale or other dispositon of said property; that on the fifth day of April, A. D. 1853, the Common Council of San Francisco passed an ordinance, duly approved by the Mayor, accepting said grant and all the conditions thereof, and directing the payment of twenty-five per cent. of all the proceeds arising from the sale of the property thereby granted (embracing the lot involved in this suit) to the State.

2d. That in the month of December, A. D. 1853, a certain ordinance purporting to give authority to the Mayor and a joint committee on land claims to sell the said land, was presented to the Common Council of San Francisco and rejected; that nevertheless,

the said Mayor and joint committee on land claims proceeded to offer said land at public auction; that the plaintiffs attended said sale and bid off four lots; that said plaintiffs paid to the said defendant on account of said bids, the sum of $19,551.74, the same being only a portion of said bids.

3d. That on the twenty-sixth day of April, A. D. 1858, (Statutes 1858, 322) the Legislature passed an act to authorize the Treasurer of the city and county of San Francisco to receive from the purchasers at said sale any sum or sums remaining unpaid by said purchasers to the city of San Francisco, and to execute to the purchaser a deed of bargain and sale, in the name of the city and county of San Francisco, of such lot or piece of land sold to him or them by the city of San Francisco, on the twenty-sixth day of December, 1853; and that said act further authorized said Treasurer to receive payment of said sums (among other things) in "genuine city Controller's warrants."

4th. That at the time of the passage of this act there were, and ever since have been liens upon said land, created in suits brought against said city; and that one of said suits is now in judgment—which judgment is a lien upon said land, and that said lien retroacts to a period prior to the passage of the Act of 1858.

5th. That these plaintiffs, on the first day of March, 1859, paid to the Treasurer of the city and county of San Francisco the residue of the amount of the aforesaid bids, and received from him a deed, under the provisions of said Act of 1858. That the payments thus made were made in paper purporting to be the indebtedness of said defendant, commonly known as city scrip, signed by the Controller of the city of San Francisco. That the said purported indebtedness or city scrip did not represent any legal indebtedness of said defendant; that the said defendant had uniformly refused to pay it; that two successive Boards of Examiners, with power to fund both the legal and equitable indebtedness of the city of San Francisco, had refused to recognize it as entitled to any consideration, and that it was worth about ten cents on the dollar in the market.

6th. That said plaintiffs do not hold and never have held the said lots adversely to said defendant, and have tendered back possession and title to defendant, and now continue that tender.

7th. That the Act of 1858 has never been accepted by the city of San Francisco. On the contrary, the city of San Francisco has uniformly refused to either sell these lands or to pay the warrants which the Treasurer, under the law of 1858, received on her behalf in payment of these lands. The city never accepted the statute by any affirmative act, and no acceptance can be presumed or implied, because the act imposes onerous conditions on the city. In the first place, it strips the city of her property. By this act, independently of her consent, she loses her land, which was conveyed to her by the State. In the water lot bill, the State has stripped herself of all rights to this property for the term of ninety-nine years. She has given to the city all dominion over it for that time ; and now, by the Act of 1858, she says to an utter stranger to the city, for the Treasurer *quoad* this is an utter stranger : " You may make deeds to this land, and your deeds shall pass the whole title of the city to your grantees." Can there be any ground for presuming an acceptance by the city of an act like this ? The very principle that acceptance is presumed where a benefit is conferred, leads necessarily to the conclusion that a refusal is presumed where by the force of an act a person is divested of his property.

In the second place, this divestiture of the city's property is attended with no corresponding benefit to her in the shape of consideration. The scrip which the Treasurer receives is illegal. It is not the paper of the city. It represents no indebtedness of hers. Twice Fund Commissioners, with full power to take into account, not merely the technically legal indebtedness of the city, but also that which, issued in defiance of her charter, she yet is in good faith bound to pay, have examined this scrip, and decided that it was mere waste paper—that the city was not legally or morally bound to pay it, and so she has positively refused to pay it. So far, then, as the city is concerned, this act of the Legislature is a mere gift of the land.

Again, at the time of these deeds there were heavy liens upon this land, and one of them has since ripened into a judgment. Now, if these deeds were good, still the lands were subject to be sold by virtue of these prior liens. And if so sold, it is clear that

the city would then become liable to the purchasers for their value. For, conceding that there was no warranty of title contained in these deeds, still it cannot be disputed that if the land of A is sold to pay the debt of B, B is liable to A for the value of the property which A has lost through the neglect of B to pay his debts. And if, through the neglect of the city to pay her debts, this property should be sold, nothing can be clearer than that the purchasers would have recourse against the city, if these deeds are the act of the city.

And further, this land, at the time of the execution of these deeds, was dedicated as a public slip—that is, the city, using her *jus disponendi* of these lands given to her by the Legislature, had granted them to the public. The act of the Legislature not only deprives her of the lands, but deprives the public of a grant made to it —a grant, the sole condition of which was, that it should remain until changed by the will and assent of the city.

This act, then—first, deprives the city of her lands; second, it gives her no consideration therefor; third, it compels her to recognize worthless scrip, illegally issued, for which she is not legally or equitably bound, which she has constantly refused to pay; and it strips the public of an easement which the city, in the exercise of an undeniable right, has previously granted. It is too clear to need further argument, that the city's consent in such a case cannot be presumed. (See 7 Ala. 268.)

In this case, however, we do not rest merely on the fact that the city has not assented to this act. She has positively refused by distinct corporate action to do the acts which the Legislature therein attempts to do for her.

1st. In December, 1853, she refused to pass an ordinance authorizing the sale of these lands.

2d. In May, 1855, the Legislature gave her power to confirm these titles. She refrained from using it.

3d. She has refused to pay the indebtedness which the Legislature tries to force upon her, and through both Boards of Funded Commissioners has declared it neither legal nor equitable.

She has thus distinctly refused either to part with these lands or

to recognize this consideration; and we have not merely the case of a negative inaction in the matter—we have a positive corporate action distinctly upon the subject matter of this act.

Three questions, then, present themselves, which are so nearly alike in principle that we shall, to a great extent, argue them together.

1st. Can the Legislature deprive the city of lands which she has acquired under the provisions of her charter authorizing her to take and hold them?

2d. Can the Legislature, after having made a contract with the city on onerous conditions, which the city has accepted and covenanted to fulfill, afterwards arbitrarily change and impair that contract.

3d. Can the Legislature impose liabilities upon the city, make contracts for her, and compel her to pay scrip which represents neither a legal nor equitable indebtedness?

It will not be contended in the case of an individual that the Legislature has any such power. If, then, it can be permitted in the case at bar, it must be because of the paramount control of the Legislature over municipal corporations; and this paramount control must exist—as, indeed, was contended for on the argument of this case—to such an extent that the Legislature can take away from the city lands and property acquired by her under her charter —can impose debts upon her which she neither morally nor equitably owes, and can exercise an unrestrained and unlimited power of binding the city, and through the city her inhabitants and the property of her inhabitants, by contracts.

The Legislature has no such power.

In the first place, if a municipal corporation can make a contract at all in her own capacity, and not as agent of the State, it is difficult to see why her contracts are not within the protection of the Constitution. The provision of that Constitution is general. It applies to all contracts. A contract made by a municipal corporation is as much within the letter of this provision as the contract of an individual. Municipal corporations, while in one sense they are branches of the general government, are, in another sense, an aggregation of individuals who acquire property for the purposes,

not of the State, but of the persons within certain limits. The rights thus acquired are an aggregation of private rights, and the State neither morally nor legally has anything to do with them, except to determine the mode and form of exercising them, and the agents by whom they shall be exercised.

Thus, as a branch of the State Government, the city levies taxes on her corporators for the use of the State. The money thus acquired is subject to the legislative control entirely. But for her municipal purposes she levies a tax under authority derived from the Legislature, and it is clear that when her corporators pay these moneys for municipal purposes, they do it under a distinct agreement and understanding made between the State and the corporation, and witnessed by the charter, that these moneys shall not be diverted by the Legislature from the purpose for which they were raised.

So, also, the Legislature has granted to the corporation the right to acquire property, not for the general uses of the State, but for the use of those within her own limits. On the strength of this power granted by the Legislature, and on the assurance in the charter contained, that the property thus acquired shall remain for the benefit of her corporators, the inhabitants cheerfully pay their taxes, make donations and bequests to the city, and take a pride in enriching a corporation whose prosperity is identified with their own. They donate lands for plazas, jails, schools, and public halls, and give what is necessary to carry on all the ramifications of a municipal government.

Is it not clear that in doing all this they are acting on the supposition that the promise made by the Legislature to the city, that the city shall hold this property to her own purposes, cannot be violated? Evidently, the whole spirit of the Constitution of the United States, in its attempt to prevent bad faith in contracts and to insure to contracting parties all that they bargain for, would be as much violated by an act of the Legislature which should donate the plaza of San Francisco to the city of Sacramento, as it would be if the Legislature should attempt to give away any of the adjoining blocks belonging to private proprietors.

In the case at bar, the State herself has made a direct contract with the city. By so doing she and the city have contracted mutual

obligations.   The State has granted to the city for a term of years certain lands with certain powers ; and for this the city has promised to pay to the State twenty-five per cent. of all the proceeds. Here are all the elements of a contract—two contracting parties;— the consent—the consideration.   There are two parties; for the language of the act is, that the State grants to the city of San Francisco—that is, that the State divests herself of her rights, and transfers them to some one else.   It is impossible to find a reason why the State should have a right to resume this grant any more than a grant to private individuals.

The counsel for the defendant urges that possible abuse is no argument against the existence of a power.   We answer, that here we have a fundamental law of the land, governing all contracts, and designed to remove the possibility of such abuses as we have here been supposing ; and that if a municipal corporation can make a contract at all, the reason of the law which takes from the Legislature the power of impairing contracts and producing these abuses applies in spirit as well as letter to a municipal corporation as much as to a private individual.   The law applies to all who are liable to the abuses which it was designed to prevent.

For authorities upon these principles, see *Holladay* v. *Frisbie*, 15 Cal. 630; *Lourey* v. *Miller*, 2 Yerg. 534; *Herrick* v. *Randolph*, 12 Vt. 530; *Grammar School* v. *Burt*, 11 Id. 640; *Fletcher* v. *Peck*, 6 Cranch. 787; 1 Pick. 224; 9 Cranch. 51; 16 Mass. 84; 17 Johns. 195; 3 Paige, 45; 4 Hill, 140; 11 Wend. 149; 9 Id. 659; 18 Id. 9; 10 Barb. 223; 22 Mo. 387; 2 Cal. 554; 6 Cranch. 136; 7 Id. 164; 4 Barb. 64; 5 Paige, 137; 4 Hill, 146; 4 Wheat. 444; 3 Hill, 531; *County of Richland* v. *County of Lawrence*, 12 Ill. 1; *State of Maryland* v. *Baltimore & Ohio R. R. Co.* 3 How. 534; *Nevitt* v. *Bank of Port Gibson*, 6 S. & M. 53; 2 Pet. 957; 5 Hayw. 186; 1 N. & M. 401; *University* v. *Fay*, 2 Hayw. 310, 374; *Den* v. *Fay*, 1 Murph. 58; *Thomas* v. *Daniel*, 2 McCord, 354; *Wales* v. *Stetson*, 2 Mass. 146; *People* v. *Manhattan Co.* 9 Wend. 351; *New Jersey* v. *Wilson*, 7 Cranch, 164; *Hardy* v. *Waltham*, 7 Pick. 110; *Atwater* v. *Woodbridge*, 6 Conn. 223; *Osborne* v. *Humphrey*, 7 Id. 335; *Landen* v. *Litchfield*, 11 Id. 251; *State* v. *Tombeckbee*, 2

Stew. 30 ; *Trustees* v. *Bradbury*, 2 Fairf. 118 ; *Norris* v. *Trustees of Abingdon Academy*, 7 Gill & Johns. 7 ; *City of St. Louis* v. *Russell*, 9 Mo. 512 ; *Benson* v. *The Mayor, etc.*, 10 Barb. 234 ; *Blanding* v. *Burr*, 13 Cal. 343 ; *Hart* v. *Burnett*, 15 Id. 530 ; *Payne & Dewey* v. *Treadwell*, 16 Id. 220 ; 7 Johns. 224 ; 16 Mass. 87.

*Heydenfeldt*, for Appellant, in reply.

I.   The city's acceptance of the Act of 1858 was unnecessary according to the doctrines of various cases decided by this Court, which yield to the sovereign the most complete authority in disposing of the property of a municipal corporation.   (*Hart* v. *Burnett*, 15 Cal. 530 ; *Payne & Dewey* v. *Treadwell*, 16 Cal. 233 ; *Perrine* v. *Canal Co.*, 9 How. 184 ; *East Hartford* v. *Bridge Co.*, 10 Id. 534 ; *People* v. *Morris*, 13 Wend. 337 ; Smith Com. 399.)

The cases cited by the respondents do not affect the principle—they are cases where the objection raised is to applying the corporate property to other uses than those of the corporation.   Such is not the object here.   The property is designed, by the Act of 1858, to pay an indebtedness of the city, and consequently is an appropriation of it to corporate purposes.   As far as such appropriation is concerned, the cases cited by us leave no doubt as to the power of the Legislature.   It is only where an attempt is made to deprive a corporation entirely of one of its rights, or rights of property, for no corporate object and for the benefit of a stranger, that the Courts have gone so far as to deny the power.   And even most of those cases are marked by the distinction between public and private corporations.

II.   The Act of 1858 does not impair the obligation of any contract.   It is true, that the Act of 1851 gave the property in question to the city for a term of ninety-nine years.

But this gift does not make the property differ from any other property owned by the city, nor does she hold it by any such special tenure or peculiar right as would take it out of the rule which concedes the authority in the sovereign power of the State to control and dispose of it for municipal purposes.   If, therefore, our position in reference to this power is sustained—if the doctrine laid

Grogan *v.* San Francisco.

down in *Payne & Dewey* v. *Treadwell* is not overruled—then there is nothing substantial to be considered in this point resting upon inviolability of contracts.

III. The same argument answers the objection that the premises were dedicated as a slip, for if the authority of the Legislature is admitted, the same act which confers the property and turns it into an individual right, by necessary implication destroys the public easement, and this last is the exercise of a power which has never been disputed wherever it has been exercised over property strictly belonging to the public.

IV. In regard to the objection that the payment to the Treasurer was not in genuine scrip, there can be but little discussion. " Genuine Controller's warrants," as used in the Act of 1858, is intended to distinguish from forged warrants, of which there was then a large amount in circulation. It was not intended to raise any questions as to the legitimacy of the issue or its informality, or the noncompliance with regulations. All these things might go to render the warrants invalid and illegal, but they are nevertheless genuine; they were really signed and issued by the Controller. The legal question is, whether a Controller's warrant is valid—not whether it is genuine; whether it can be recovered—not whether it was signed.

FIELD, C. J. delivered the opinion of the Court—COPE, J. concurring.

This case has grown out of the attempted sale by the authorities of San Francisco, in December, 1853, of certain property known as the city slip property. On the fifth of that month, an ordinance for the sale of the property was presented to the Board of Assistant Aldermen of the city and put upon its passage. At the time there was a vacancy in the Board, occasioned by the resignation of one of its members, so that there were only seven members in office. Of this number four members voted for the ordinance and three against it. As a consequence, the ordinance was not passed, but was in fact rejected—the Charter of the city then in force declaring that no ordinance should " be passed unless by a majority of all the members elected to each Board "—a clause which this

Court has held required for the passage of an ordinance a majority of the votes of the entire number which the Charter provided should be elected. Notwithstanding the ordinance was thus rejected, the Board declared it passed, and it received the approval of the Mayor and was published as a valid ordinance of the city. It is designated in the official book of city ordinances, as Ordinance No. 481. Assuming to act under its provisions, the Mayor and Land Committee mentioned therein, on the twenty-sixth of December, 1853, put up the property for sale and struck it off in parcels to different parties. Among these parties were the plaintiffs ; they bid off four lots, and paid on account for the same the sum of $19,551.74 ; the greater portion of the amount on the thirtieth of December, 1853, and the balance in the months of February and May of the following year. It is for this amount the present action is brought.

The money paid by the plaintiffs went into the treasury of the city, and was afterwards appropriated to various municipal purposes. This appropriation, as we held in the case of *McCracken* v. *The City of San Francisco*, (16 Cal. 616) did not operate as a ratification of the sale, any more than the appropriation of moneys received for an illegal assessment would have operated to validate such assessment. The resolutions and ordinances which made the appropriation did not purport to ratify the alleged ordinance, but on the contrary, proceeded upon the assumption of its original validity. Besides this, there were insuperable difficulties in the way of any ratification. The property offered for sale had been previously dedicated to public use as a dock, by an ordinance passed as early as 1852, and until the dedication was revoked no sale could be made, and of course none could be ratified. The alleged Ordinance No. 481 contained a clause directed to the repeal of the dedication, but as the ordinance itself was rejected, the repealing clause fell with it. Again, by the Charter, all sales of the city property were required to be made at public auction. This mode was essential to the validity of any sale. A ratification of an illegal public sale is in effect making a private one. The object of the ratification is to vest in the purchaser the title, as he had acquired none previously, and for that purpose to confirm to

Grogan v. San Francisco.

him the sale at the prices already offered—that is, to make a sale upon the consideration of the original bid. At public auction this could not be done, for the very essence of an auction sale is that every one is at liberty to bid, and that the property shall fall to the highest bidder. It could only be done by a private arrangement, and as a consequence could not be done at all by the Common Council under the restrictions of the Charter. The case would be different if the Common Council had possessed authority to dispose of the municipal property at private sale. They could then have said : We will confirm the previous proceedings ; we will take the money already advanced, and what is to be advanced upon the bid, as the consideration, and transfer the title. But as the power of disposition could only be exercised in one way—by a direct ordinance authorizing a public sale, after due advertisement of the time, place and terms—no other mode could be adopted in its stead. Appropriation of the proceeds, proceedings upon the assumed validity of the sale, reference to the ordinance as having been passed would, not answer the requirements of the Charter. The Common Council were not invested with any discretion to substitute a different mode for the disposition of the city's property in place of the one provided. A private proprietor, having full power over his own property, may ratify an unauthorized sale of the same made by a person assuming to be his agent, without reference to its mode, whether made publicly or privately ; he may in some instances be estopped from denying the act of the assumed agent, after appropriating its benefits with knowledge of the facts. So the State may ratify the acts of her agents upon a subject within the constitutional control of the Legislature, when they exceed their powers. She may do this by legislation directly affirming the acts, or by legislation proceeding upon their assumed validity. The reason is obvious; there is no limitation as to the mode in which the State may give her assent, except that it must be by an act or resolution of her Legislature. Not so with a municipal body under restrictions such as controlled the action of the Common Council of the city of San Francisco. They could give their assent to the sale of the city's property only in one mode. It is unnecessary to refer to adjudged cases in support of these views.

They are in accordance with the general current of all the authorities.

The case of the plaintiffs, upon the facts we have stated as to the alleged ordinance and sale, is similar to that of *McCracken* v. *The City of San Francisco*. The Mayor and Land Committee acted without authority, and the proceedings taken by them were void; as much so as if they had been taken by strangers to the city and to her government. The plaintiffs acquired no title or claim of title by their bids and the payment of their money. The city obtained the money without consideration, and used it, and, unless some subsequent matter has released her from liability, she is legally and morally bound to refund it to them.

Such subsequent matter is alleged to exist—effecting the city's release from the liability—in the Act of the Legislature of April 26th, 1858, entitled "An Act to authorize the Treasurer of the City and County of San Francisco to execute certain deeds and cancel certain claims," and the acceptance by the plaintiffs of conveyances from the Treasurer purporting to be executed in pursuance of its provisions. That act provides that the Treasurer of the city and county shall receive from the purchasers at the sale of the twenty-sixth of December, 1853, or their assigns, any sum or sums remaining unpaid by them respectively for the real estate sold under Ordinance No. 481; that the same may be paid " in cash or in any judgment against said city; or in any bonds of said city, or of said city and county, which have heretofore been issued, or may hereafter be issued; *or in any genuine city Controller's warrants* that may have been issued on or after the first of May, 1851, or any three per cent. scrip issued by said city prior to the first of May, 1851; *provided* said judgments or bonds have not been paid; and *provided* said Controller's warrants and said scrip have not been funded under any of the Funding Acts heretofore passed; and *provided further*, that no judgments have been recovered on any of said warrants or scrip;" that upon the receipt of the amounts due in the manner thus provided, the Treasurer shall execute, in the name of the city and county of San Francisco, a deed of bargain and sale to the purchasers of the lots sold to them respectively; that the deed shall convey the right, title and interest both

of the city and of the city and county, and be *prima facie* evidence
of the regularity of the proceedings of the city preliminary to the
sale, and of the title and right of possession of the grantees against
the city and the city and county; and that upon the deed, actions
for the recovery of the property, and for injuries thereto, may be
maintained.    This act, as we construe it, contemplates two things :
*first,* the payment by the purchasers of the balance of their bids
at the sale in December, 1853, either in cash or in valid obliga-
tions of the city; and *second,* the conveyance to them, upon such
payment, of the title which they would have acquired had the sale
been originally authorized.    The only doubt as to this construction
arises upon the meaning of the terms, " genuine City Controller's
warrants."  . All other obligations specified are such as the city was
legally bound to pay, and could be properly taken as an equivalent
for cash; but this clause, it is insisted, was intended to include not
only warrants which were legally issued, but those which were
issued without authority, and, therefore, not binding upon the
city, provided the signatures of the officers attached to them were
not forged.    We do not give this meaning to the terms; we think
they were intended to embrace only warrants representing a gen-
uine indebtedness of the city, and issued by the authority of the
city.    It was not the object of the act to require deeds of gift
from the city, or deeds without further consideration where any
balance of the original bids remained unpaid, as would, in effect,
be the case if warrants illegally issued were receivable in payment,
but to authorize conveyances which the Common Council, under the
restrictions of the Charter as to the sale of the city property, were
incompetent to give, and the receipt of the unpaid balance in valid
obligations of the city.    This view as to the character of the war-
rants is strengthened by their connection in the act with other obli-
gations of acknowledged validity, and the proviso that they had not
been previously funded .or merged in judgments.    The warrants,
or " city scrip," as they are termed in the report of the referee,
received by the Treasurer, upon which the conveyances to the plaint-
iffs were executed, did not represent any legal or equitable indebted-
ness of the city ; their payment had uniformly been refused by the
city, and two successive Boards of Examiners had rejected them as not

entitled to any consideration whatever. The Treasurer did not, there-
fore, pursue the authority of the statute in receiving them, and his
acts in executing the conveyances were in consequence illegal and void.

But independent of this view of the warrants, there is a fatal
objection to the validity of any conveyance by the Treasurer. The
Act of the Legislature was never accepted by the city. This is
found as a fact in the report of the referee. The property con-
veyed is part of the beach and water lot property covered by the
Act of the Legislature of March 26th, 1851, entitled "An Act to
Provide for the Disposition of Certain Property of the State of Cal-
ifornia." By that act a grant is made to the city of the use and
occupation of the property for the period of ninety-nine years, with
a proviso that the city shall pay into the State Treasury, within
twenty days after their receipt, twenty-five per cent. of all moneys
arising in any way from the sale or other disposition of the property.
The proviso is not a qualification of the estate granted; it is only
a reservation by the State of a portion of the proceeds received,
creating an obligation on the part of the city, upon the acceptance
of the grant, to pay such portion into the State treasury. The
estate having vested in the city, ceased to be subject to the legis-
lation of the State, except to the same extent that all property is
thus subject. It could not be afterwards divested by the State, or
by any proceedings instituted by her direction. "A law," says
Mr. Chief Justice Marshall, " annulling conveyances between indi-
viduals, and declaring that the grantors should stand seized of their
former estates, notwithstanding those grants, would be as repug-
nant to the Constitution as a law discharging the vendors of prop-
erty from the obligation of executing their contracts by convey-
ances." (Fletcher v. Peck, 6 Cranch, 137.) And between a law
thus annulling the conveyances, and a law directing the execution
of conveyances to third parties of the estate granted, without the
consent of the grantees, it is not perceived that there is any sub-
stantial difference. The law might as well declare that third parties
should possess the estate, and direct the mode of its transfer to
them, as to declare that the original grantors should stand seized of
the same. Nor is there any difference in the inviolability of the
contract between a grant of property to an individual and a like

grant to a municipal corporation. So far as municipal corporations are invested with subordinate legislative powers for local purposes, they are mere instrumentalities of the State for the convenient administration of the Government, and their powers are under the entire control of the Legislature; they may be qualified, enlarged, restricted or withdrawn at its discretion. But these bodies, says Kent, " may also be empowered to take and hold private property for municipal uses, and such property is invested with the security of other private rights." (1 Com. 3 vol. 275.) " It may also be admitted," observes Mr. Justice Story, in his opinion in the case of *The Trustees of Dartmouth College* v. *Woodward*, " that corporations for mere public government, such as towns, cities and counties, may in many respects be subject to legislative control. But it will hardly be contended that, even in respect to such corporations, the legislative power is so transcendant that it may, at its will, take away the private property of the corporation or change the uses of its private funds acquired under the public faith." (4 Wheat. 694.) " The inhabitants of the city of New York," says the Supreme Court of New York, " have a vested right in the city hall, markets, water works, ferries and other public property, which cannot be taken from them any more than their individual dwellings or storehouses. Their rights, in this respect, rest not merely upon the Constitution, but upon the great principles of eternal justice, which lie at the foundation of all free governments." The authorities are all to the same purport. A legislative grant is an executed contract, and as such is within the clause of the Constitution of the United States which prohibits the States from passing any law impairing the obligation of contracts. This was expressly decided by the Supreme Court of the United States in *Fletcher* v. *Peck* (6 Cranch, 137). It cannot therefore be destroyed, and the estate be divested by any subsequent legislative enactment. And though a municipal corporation is the creature of the Legislature, yet when the State enters into a contract with it, the subordinate relation ceases, and that equality arises which exists between all contracting parties. And however great the control of the Legislature over the corporation, it can be exercised only in subordination to the principle which secures the inviolability of contracts.

These considerations, without reference to the character of the warrants received, furnish an answer to the position that the conveyances taken by the plaintiffs from the Treasurer operated as a release of their demand. That act directs the Treasurer to convey the property attempted to be sold under the alleged ordinance of December, 1853, and thus to divest the city of her estate. The city, it is to be borne in mind, has never authorized a sale of her interest. The ordinance proposed for that purpose, as we have stated, was not passed, but was in fact rejected, as it did not receive the requisite vote in the Board of Assistant Aldermen, under the provisions of the charter. The Legislature, however, steps in, and by the Act of 1858 says that the city's interest shall, notwithstanding, be transferred to the bidders at the illegal sale, made in accordance with the rejected ordinance, upon considerations which she herself designates. To this act, as we have stated, the city has never assented; and without such assent the act never acquired any force or efficacy whatever. The conveyances of the Treasurer were therefore inoperative to pass any interest in the property, and the title remains, as it did previously, in the city. The rights of the plaintiffs and the obligations of the city are both unaffected by the unauthorized acts of the Treasurer.

The remark in the concluding observations of the opinion in *McCracken* v. *The City of San Francisco*, upon the amount supposed to depend upon the decision in that case, that, as we were informed, many of the purchasers at the sale in December, 1853, had taken deeds under the Act of 1858, or the amendatory Act of 1860, and thereby released their claims to reimbursement of their purchase money, was made upon the impression received from the information—for those acts were not under consideration at the time, nor was any question arising upon them—that the acts had been accepted by the city, and had been pursued in the execution of the conveyances by the Treasurer. As the acts were not accepted by the city, nor pursued by the Treasurer, the remark has no application.

The cases of *Hart* v. *Burnett*, (15 Cal. 530) and *Payne* v. *Treadwell*, (16 Cal. 222) cited by the counsel of the appellant, do not conflict with the views we have expressed as to the authority of

the Legislature over the property of a municipal corporation. They both treat of lands held by the city of San Francisco as successor of the former pueblo, and of the power of the Legislature to validate a grant of such lands previously made by the act of the city. Those lands were held by the pueblo, and the city as its successor, in trust for public municipal purposes, and the trust was subject to the direction, supervision and control of the Government. The cases cited have no application to a case like the present, where the Legislature has undertaken to divest property, which is not held upon any such trusts, without the city's previous consent, or the city's subsequent acceptance of its act.

Judgment affirmed.