PIMENTAL *et al. v.* THE CITY OF SAN FRANCISCO.

THE several cases which have been before this Court in relation to the liability of the city of San Francisco to the parties who bid off the city slip property at the attempted sale by the city authorities in December, 1853, under an alleged ordinance, designated as Ordinance No. 481, commented upon, and held to have decided and settled the following points :

*First*—That the ordinance, so called, was never passed, and was, therefore, a nullity.

*Second*—That the sale made in pursuance of it was, therefore, invalid and passed no title to the bidders.

*Third*—That the bidders were entitled to recover back from the city the purchase money paid by them, and received and appropriated by the city authorities.

*Fourth*—That they were not precluded from a recovery either: 1st, by reason of any want of privity between themselves and the city; or 2d, by the alleged subsequent adoption by the city authorities of the ordinance directing the sale; or 3d, by reason of a subsequent alleged ratification of the sale by an appropriation of the proceeds; or 4th, by the clause in the city charter restraining the corporation from contracting liabilities beyond the sum of $50,000 ; or 5th, by the Act of the Legislature of 1858, authorizing the City Treasurer to execute deeds to the purchasers on certain conditions.

Claims against the city of San Francisco by the bidders at the attempted sale in December, 1853, for the purchase money paid on such sale, are within the fourth subdivision of the seventeenth section of the Limitation Act, and are barred by a failure to sue within two years from the date of the receipt of the money by the city.

Pimental *v.* City of San Francisco.

The filing of a complaint in the proper Court, without the issuance of a summons thereon, is the commencement of an action within the terms and meaning of the Limitation Act, and stops the running of the statute.

The complaint, in an action to recover back from the city of San Francisco purchase money paid upon the invalid sales of her city slip property in 1853, was filed April 21st, 1856, and alleged that one installment of the purchase money was paid December 27th, 1853, another February 27th, 1854, and a third April 27th, 1854, and that these several payments were received by the city on the respective days of their payment. The referee to whom the case was referred found as a fact, that the several payments were made to the city and accepted by her as alleged in the complaint: *Held,* that the defense of the Statute of Limitations pleaded by the city must be sustained as to the first two installments, and disallowed as to the third.

APPEAL from the Fourth Judicial District.

This is an action to recover the sum of $7,900 alleged to have been received from the plaintiff by the city of San Francisco upon an alleged sale of a parcel of certain property, known as the city slip property, situated within the limits of the said city—$1,975 on the twenty-seventh of December, 1853, $3,950 on the twenty-seventh of February, 1854, and $1,975 on the twenty-seventh of April, 1854. The complaint was filed on the twenty-first of April, 1856, and the summons was issued on the twenty-fourth of December, 1860. The facts of the case are sufficiently stated in the opinion of the Court. A more detailed statement of the facts relating to said alleged sale are found in the report of the case of *McCracken* v. *The City of San Francisco* (16 Cal. 591) and in the report of the case of *Grogan* v. *The City of San Francisco* (18 Id. 590).

In the present case the plaintiff had judgment, and the defendant appeals.

*O. L. Shafter,* for Appellant.

The bar of the statute is interposed, in the first place, to the whole claim ; and, in the second place, to the first two payments made to and received by the city on the twenty-seventh of December, 1853, and on the twenty-seventh of February, 1854, respectively.

The defense to the whole claim will first be considered. The

Pimental v. City of San Francisco.

complaint was filed on the twenty-first day of April, 1856—two years from the payment and receipt of the third and last installment, lacking eight days.   The summons was not issued until the twenty-fourth day of December, 1860—four years and about eight months after the filing of the complaint.   The statute provision is as follows: "An action shall be deemed to be commenced, within the meaning of this act, when the complaint has been filed in the proper office."

There is nothing in the pleadings, findings, or evidence, furnishing the slightest explanation for the plaintiff's protracted delay in taking out the summons.   The delay cannot be attributed to any delinquency of the Clerk.   When a complaint is filed the summons does not go of course.   It is not the duty of the Clerk to issue process until it is applied for.   The provision of the Practice Act (Sec. 22) is as follows: "At any time after the filing of the complaint, the plaintiff may have a summons issued."   This is decisive to show that the issuance of the summons is a matter left entirely to the plaintiff's direction.   We claim, then, this result: That the unexplained interval of four years and eight months lying between the filing of the complaint in this action and the issuance of the summons was by reason of the plaintiffs' omission to call for it alone; and that such omission was the result of choice on their part, and not of necessity, accident, mistake, or fraud on the part of others.   Did the statute give the plaintiffs the right to make this choice, thus arbitrarily ?   Are they relieved of the necessity of making explanations ?   The answer to be given to these questions depends, to some extent, upon the interpretation of the word "filing," as it is used in the statute.

*First*—There are but three views possible, and are as follows:

1. That after the filing of the complaint the summons must issue immediately and be immediately thereafter delivered to the officer for service.   This view is untenable, without doubt.

2. That the filing of the complaint, *ipso facto*, puts the claim of the plaintiff beyond the reach of the statute forever.

3. That the complaint having been filed, the party, within a reasonable time thereafter, must take the next step called for by the routine of procedure, viz.: issuance of summons to the Sheriff.

Which of these last two views is the correct one ? To the first of the two there is one general objection. It involves an utter abandonment of the policy with reference to which alone Statutes of Limitations are supposed to have been framed; and, in short, leaves the statute without any efficient or intelligible purpose. If the mere filing of the complaint, of itself, takes a claim out of the Statute of Limitations for all time, then it is a Statute of Limitations only in a very narrow sense. It in no sense limits the accumulation of stale claims, nor does it diminish the possibilities of individual and social disquiet connected with suits prosecuted to enforce them. The filing of the complaint does not prevent the death of witnesses or their dispersion; it does not lessen the power of time to work a destruction of papers, nor does it furnish any appliance to aid or forestall the proverbial infirmity of human memory. In short, though the statute is a remedial one in theory, yet it remedies nothing in fact; though passed to correct serious mischiefs, it tolerates and nurses the whole brood.

Under this construction, the statute is not and cannot be in its outcomes a " statute of repose." The maxim " *vigilantibus non dormientibus jura subveniunt* " is reversed, and in its relations to every description of claim is made to read " *dormientibus non vigilantibus jura subveniunt.*" The maxim of " *interest reipublicæ ut sit finis litium* " loses all its ancient dues; and to sum the whole up in a word, a question of great public concern is virtually withdrawn from the control of law, and submitted for determination to the caprice or interested views of a party.

As opposed to this view of the true intent of the statute, we insist that the filing of the complaint commences the action only *de bene esse;* and if the plaintiff does not use reasonable diligence in the matter of taking the next step, the action must be held, by legal conclusion, not to have been efficiently commenced, or as having been abandoned, or as having been brought in fraud of the policy of repose, upon which the statute proceeds. These are to be regarded as merely different modes of stating a point which is substantially one and the same in legal idea.

As justifying the construction which we claim to be the true one, there are a number of considerations that may be adverted to :

I.   The doctrine of reasonable diligence pervades the whole body of the law.   It approximates universality more nearly than any other single truth in the general canon.   It connects itself, in some form, with every right, and with every private and every public duty.

II.   By the rule of the common law, a suit was commenced, within the meaning of the Statute of Limitations, by the issuance of a summons, and delivering it or sending it to the Sheriff, with a *bona fide* intent to have it served.   (*Burdick* v. *Green*, 18 Johns. 14; *Vischer* v. *Gansevoort*, Id. 496; *Ross* v. *Luther*, 4 Cow. 161.)

III.   The doctrine of reasonable diligence has already been wrought into the texture of the statute by judicial construction. By the common law, the death of a plaintiff abated the suit, and the executor was compelled to commence *de novo*.   If a party, having brought his action before the statute had run, died after it had run, the executor was allowed to bring a new action within a reasonable time after the death.   Still, the Statute of James, in its letter, hinted at no such right.   (*Kinsey* v. *Heyward*, 1 Lord Raym. 434; *Schermerhorn* v. *Schermerhorn*, 5 Wend. 513.)

IV.   Our Statute of Limitations is fraught with positive recognitions of the rule of reasonable diligence.   They are set forth in detail in the twenty-second, twenty-third, twenty-fourth, twenty-fifth, twenty-sixth, twenty-seventh, twenty-eighth, and twenty-ninth sections.   These sections, and the one relating to the commencement of actions, are all *in pari materia*.   It is assumed that they all proceed upon the same policy, and that they are designed to secure a common end by kindred modes and on the basis of kindred ideas.   *Noscitur a Sociis*.   (*Pudney* v. *Griffiths et al.*, 15 How. Prac. Rep. 410.)

V.   The construction which we resist results in the strange anomaly, that the filing of a complaint by the plaintiff is more than the equivalent of a new promise, or of any number of new promises short of infinity, made by the defendant.

VI.   The adverse view goes entirely on the literal import of the word "filing," and excludes peremptorily from consideration all the matters hereinbefore adverted to, as being utterly foreign to this contested question of construction.   The statute is remedial, and

literal interpretation is not the rule.   "*Qui hæret in litera hæret in cortice*" contains at once a rule and rebuke.   Literal interpretation here would, however, be fatal to the respondents—for their complaint was never "strung upon either thread or wire."

But, passing this, the meaning of the word in the minor law and in the rules of Court, and in the dialect of prothonotaries and clerks, is well understood.   But here the word is used in a more important relation, and it is enlarged and ennobled by the more exalted use to which it is put.   "In interpreting an Act of Parliament it is not in general a true line of construction to decide according to the strict letter of the act; but Courts will rather consider what is the fair meaning, and expound it differently from the letter, in order to preserve the intent.   The meaning of particular words, indeed, in Acts of Parliament, as well as in other instruments, is to be found, not so much in strict etymological propriety of language, or even in popular use, as in the subject or occasion in which they are used and the object that is intended to be attained."   (Broom's Maxims, 536.)

*Second*—Assuming, then, that the plaintiffs, having filed their complaint, were obliged to take out a summons in a reasonable time thereafter, and deliver it or send it to the Sheriff, with a *bona fide* intent to have it served, is there any rule by which, on the facts of this case, the law can determine for itself whether the limits of such reasonable time have or have not been transcended by the plaintiffs ?

In *Kinsey* v. *Hayward* (1 Lord Raymond, 434) his Lordship quaintly remarks : "The law delighteth in a year, as may be instanced in many cases."   This delight is manifested in the rule of "continual claim ;" in the rule limiting the issuance of executions on judgments to one year from the date of their rendition; in the rule under which tenancies, originally at will, are run into tenancies from year to year.   The English Chancery seems also to have been affected with the "delight" in question—for a mortgagor in a foreclosure case was allowed a year in which to redeem.

In *Huntington, Administrator*, v. *Brinckerhoff* (10 Wend. 278) the Court say : "Such reasonable time (for an executor to sue) is generally one year after the death of the testator, unless there be special causes to be shown and approved by the Court."

*Third*—But if the statute should fail as a defense to the whole claim of the respondents, then it is presented to the first two payments—the one being twenty-five per cent. and the other fifty per cent. of the whole amount. The referee finds as matter of fact that the first payment was made twenty-eight months and that the second was made twenty-six months before the complaint was filed. And it is found that both payments were made to the defendant, and that they were both received by the defendant twenty-eight and twenty-six months respectively anterior to the commencement of the action.

The statute began to run from the moment that the money was had and received by the defendant to the plaintiffs' use. " When a debt is payable at several times—that is, by installments—the time begins to run from the expiration of the first term, for the part then payable, and for other parts only from the day of the expiration of the respective terms of payment." (Ang. on Lims. 105.)

Where money has been paid by mistake, the statute begins to run from the time when the mistake was committed, not from the time when the mistake was discovered. (Id. 109.)

*W. H. Patterson*, for Respondents.

I.   The defendant having received plaintiffs' money without any consideration is to be treated as bailee or depository, and thus the Statute of Limitations does not run, or commence running, until a demand, or until the commencement of the action, which was a demand. (*Phelps* v. *Bostwick*, 22 Barb. 314, 318; *Brown* v. *Cook*, 9 Johns. 361; *Beardslee* v. *Richardson*, 11 Wend. 25; Edwards on Bailments, 85, 87.)

II.   The position of the appellant as to the construction of the Statute of Limitations is not tenable. He contends that the statute, " an action shall be deemed to be commenced within the meaning of this act when the complaint has been filed in the proper office," should not be read according to its plain provisions, but that the Court should assume the province of the Legislature and add after the word " office " the words " and a summons has been issued with a *bona fide* intent to have it served," or " and the issuance of a summons within a reasonable time thereafter," and insists that *Sharp* v. *Maguire* (19 Cal. 577) shall be overruled.

Pimental *v.* City of San Francisco.

This Court has heretofore never assumed the duties of the Legislature, and we hardly think that it will do so for the first time to defeat a just claim by the bar of the Statute of Limitations.    In construing the Statute of Limitations, the Supreme Court of New York in *White's Bank of Buffalo* v. *Ward* (35 Barb. 643) said : " Without the statute there is no pretense that defendant had any defense.    If he seeks to avail himself of the provisions of the Statute of Limitations to relieve himself from liability, he must be subjected to all the conditions therein imposed, one of which, as has been seen, is, that if the action is commenced by the service of the first process upon one of the several defendants jointly indebted, it is to be deemed a sufficient commencement of action to prevent any of the defendants, who may not have been served with process therein until more than six years after the cause of action accrued, from availing themselves of the statute."

It was a maxim of the common law—" a right never dies," and there was therefore no limitation to the time within which an action on contract might be brought.    ( *Williams* v. *Jones*, 13 East. 449 ; Joynes on Limitations, 13.)    The statute is in derogation of the common law, and hence the rule which has been applied, " that they must be strictly construed."    Hence, also, the rule that these statutes operate on the remedy only, and do not extinguish the right itself.    ( *Williams* v. *Jones*, 13 East. 439 ; *Higgins* v. *Scott*, 1 B. & Adol. 413 ; *Jones* v. *Hook*, 2 Rand. 303 ; *Barney* v. *Smith*, 4 Harris. & John. 495.)

At the common law, as is claimed by appellant, actions were commenced by the issuance of a capias and delivery to the Sheriff, with intent to have it served.    But from time immemorial a different rule prevailed in equity, and the filing of the bill (complaint) was a commencement of the action to take the case out of the operation of the statute.    (2d ed. Revised Stat. of N. Y. 227 ; 2 Barb. Ch. Prac. 53 ; 1 Id. 53 ; 3 Paige, 204 ; 7 Id. 197 ; 24 Wend. 587 ; 2 Denio, 577.)    So in England.    (Newland's Ch. Prac. 1, ed. of 1818 ; 1 Daniel's Ch. Prac. secs. 468, 469.)    In this State an uniform rule is established by the Legislature, applicable alike to actions at law and suits in equity.

The filing of a claim in set-off held in Massachusetts to be equiv-

alent to the commencement of an action, etc.   (*Hunt* v. *Spalding,*
18 Pick. 521.)   In Maryland (10 Gill & Johnson, 326) the run-
ning of the Act of Limitations is arrested by the docketing of an
action with directions to the Clerk to issue the necessary process,
whether such process is issued or not.   " The filing of the bill is
the commencement of the action, although the subpœna be not
taken out till the limitation has expired."   (*Morris* v. *Ellis,* 7 Jur.
413 ; *Purell* v. *Blannerhassett,* 3 J. & L. 24 ; *Foster* v. *Thomp-
son,* 2 Con. & L. 568, and note 2 ; Angell on Limitations, sec.
330 ; *Henry Miller's Heirs and Devisees* v. *McIntire,* 6 Pet. 61 ;
*Steindale* v. *Hawkinson,* 2 Eng. Ch. 393 ; 1 Simon, 1 ; McLean,
11 ; *Christians* v. *Mitchell,* 3 Iredell's Eq. 542.)

The Legislature having used the word " filing," etc., in a technical
sense, the Court should so construe it.   (1 Kent's Com. 462 ;
*Clark* v. *City of Utica,* 18 Barb. 451 ; Sedgwick on Statutes,
261–263, and cases there cited ; 4 Pick. 405 ; 24 Id. 296.)

FIELD, C. J. delivered the opinion of the Court—COPE, J. and
NORTON, J. concurring.

This is one of the numerous cases which have grown out of the
attempted sale by the authorities of the city of San Francisco, in
December, 1853, of the property known as the City Slip Property.
The general facts in all of them upon which the liability of the
city is asserted, lie within a narrow compass ; but the defenses
interposed have varied with the different cases, and have not always
been consistent with each other.   In some of the cases, the entire
transactions giving rise to or connected with the alleged sale,
including the receipt and appropriation of the moneys derived there-
from, have been treated as transactions to which the city was an
absolute stranger ; in other words, a want of privity between the
bidders and the city has been asserted ; in other of the cases, a
subsequent adoption of the ordinance directing the sale has been
alleged, and a ratification of the sale by the appropriation of its
proceeds.   In some the restraining clause of the charter against
the incurring of liabilities has been relied upon, and in others, as
in the present case, the length of time in which the claim against
the city has existed is set up as a bar to its recovery.   In the

meantime the indebtedness against the city, if obligatory at all as such, has been increasing at a rapid rate by the accumulation of interest and the heavy expenses of protracted litigation, until the amount at present exceeds, it is believed, a million of dollars. It is desirable, therefore, not only for the claimants, but for the city, that the controversy between them should be brought to a termination. It may be well, therefore, before proceeding to consider the question immediately arising in the case at bar, to briefly state the different positions already considered and settled by this Court.

The facts out of which the litigation has arisen are briefly these: On the fifth of December, 1853, the Mayor of San Francisco approved of what purported to be an ordinance passed by the Common Council of the city, providing for the sale of the City Slip Property. This ordinance, so called, in terms authorized and required the Mayor and Joint Committee on Land Claims to sell the property at public auction after certain days advertisement, and provided that twenty-five per cent. of the purchase money should be paid on the day of sale, fifty per cent. in sixty days thereafter, and the balance in four months. At the time this ordinance was acted upon by the Board of Assistant Aldermen, there was a vacancy in the Board, occasioned by the resignation of one of its members, so that of the eight members elected only seven remained in office. Of this number four members voted for the passage of the ordinance, and three against it. As a consequence the ordinance was not passed, not having received the necessary vote required by the charter then in force. The charter vested the legislative power of the city in a Common Council, consisting of a Board of Aldermen and a Board of Assistant Aldermen, each Board to be composed of eight members, and fixed the limits of their authority. It empowered them to pass all " proper and necessary laws " for the sale of the city property—that is, all proper and necessary ordinances for that purpose, for " laws " and " ordinances," when applied to the acts of municipal corporations, are synonymous terms. But it declared that no ordinance should be passed " unless by a majority of all the members elected to each Board." The ordinance in question, therefore, not having received the vote of a majority of all the members elected, was never passed.

Pimental *v.* City of San Francisco.

It was, in fact, rejected—as much so as if every member had cast his vote against its passage.  It was, therefore, for all purposes an absolute nullity.  The Board, however, declared it passed, and it received, as we have stated, the approval of the Mayor, and was published as a valid ordinance of the city.  It is designated in the official book of the city ordinances as Ordinance No. 481.  Treating it as a valid ordinance, and assuming to act under its provisions, the Mayor and Land Committee, on the twenty-sixth day of December, 1853, put the property up for sale at auction, and struck it off in parcels to different parties.  A portion of the purchase money was paid by the bidders at the time, or within a few days afterward, and another portion, or the entire balance, within the following year.  In the present case the plaintiffs bid off one of the parcels for $7,900, and paid the first installment, one-fourth thereof, on the day following the sale ; the second installment, one-half thereof, in February, and the balance in April, 1854.  For the amounts paid by the respective bidders, whatever they were, the several actions against the city were brought.

The moneys paid by the bidders went into the treasury of the city, and were afterward by different ordinances and resolutions appropriated to municipal purposes.  To the different actions, as we have mentioned, various defenses have been interposed.  In some of them, as already stated, the entire transactions giving rise to or connected with the alleged sale have been treated as transactions to which the city was an absolute stranger ; in other words, a want of privity, as it is termed, between the bidders and the city has been alleged.  This alleged want of privity, as we understand it, amounts to this : that inasmuch as the Mayor and Land Committee had no authority to make the sale, they had no authority to pay the money which they received from the bidders into the treasury of the city, and therefore no obligation can be fastened from such unauthorized act upon the city.  The position thus restricted in its statement is undoubtedly correct, but the facts of the cases go beyond this statement.  They show an appropriation of the proceeds, and the liability of the city arises from the use of the moneys, or her refusal to refund them after their receipt.  The city is not exempted from the common obligation to do justice, which binds

24

individuals. Such obligation rests upon all persons, whether natural or artificial. If the city obtain the money of another by mistake, or without authority of law, it is her duty to refund it, from this general obligation. If she obtain other property, which does not belong to her, it is her duty to restore it, or if used, to render an equivalent therefor, from the like obligation. (*Argenti* v. *San Francisco*, 16 Cal. 282.) The legal liability springs from the moral duty to make restitution. And we do not appreciate the morality which denies in such cases any rights to the individual whose money or other property has been thus appropriated. The law countenances no such wretched ethics; its command always is to do justice.

In the first case which came before this Court—*Holland* v. *The City of San Francisco*—the doctrine of a want of privity was announced. Had this doctrine prevailed, the purchasers would have lost both the property and their money, while the city would have retained both. This result was so manifestly unjust that a rehearing was granted without hesitation; and on the reargument the position was considered so unsound that it was not noticed by counsel. Mr. Chief Justice Murray, alluding to it, said: "It will hardly be necessary to adduce any argument to establish the proposition that the former opinion of this Court was erroneous. A mere reference to it is sufficient, and the point on which it was predicated seems to have been abandoned by the unanimous consent of the Court and counsel." (7 Cal. 338.)

In some of the actions, the subsequent adoption of the ordinance directing the sale of the slip property has been alleged, as a defense, by the city. In *Holland* v. *San Francisco*, this Court held—Justices Burnett and Terry rendering the decision, Chief Justice Murray dissenting—that an ordinance which was passed within an hour previous to the sale, and which referred to the ordinance directing the sale, and appropriated a portion of its anticipated proceeds, did, in fact, by such reference and appropriation, recognize and adopt the first ordinance, so as to render the subsequent sale valid and binding upon all parties. This decision was overruled in *McCracken* v. *The City of San Francisco*, as it was too palpably unsound to stand the test of the slightest investiga-

tion. Indeed, we have never yet met with any lawyer who had the hardihood to attempt its justification. The reference in the second ordinance, independent of the appropriation it makes to the previous ordinance, did not add anything to the validity of that ordinance. There is no efficacy in the mere reference to previous legislation, whether valid or invalid. Nor did the appropriation designated in the second ordinance operate as an adoption of the previous ordinance. An ordinance cannot in this way be passed; it can only be passed in one way—by a majority of both Boards of the Common Council voting for it. The doctrine asserted in the decision, as we said in the McCracken case, "is unsound in principle and is unsupported by any authority; and could it be maintained, would break down and destroy all the checks imposed by the Legislature upon the exercise of the powers of the Common Council. Upon this doctrine that body could at any time adopt the unauthorized acts of others—in the levy of taxes, in the sale of public property, in the opening of streets, in the infliction of penalties, and by admitting in one ordinance that it had previously passed an ordinance for those purposes, give validity to those acts."

The subsequent ratification of the sale by the appropriation of its proceeds has also been alleged as a defense. But this appropriation did not operate, as we held in the McCracken case, as a ratification any more than the appropriation of moneys received from an illegal assessment would have operated to give validity to such assessment. The ordinances and resolutions making the appropriation did not purport to ratify the sale, but proceeded upon its assumed validity. But in addition to this, as we said in *Grogan* v. *San Francisco*, (18 Cal. 608) "all sales of the city property were required to be made at public auction. This mode was essential to the validity of any sale. A ratification of an illegal public sale is in effect making a private one. The object of the ratification is to vest in the purchaser the title, as he had acquired none previously, and for that purpose to confirm the sale at the prices already offered —that is, to make a sale upon the consideration of the original bid. At public auction this could not be done, for the very essence of an auction sale is, that every one is at liberty to bid, and that the property shall fall to the highest bidder. It could only be done by

a private arrangement, and as a consequence could not be done at all by the Common Council under the restrictions of the charter. The case would be different if the Common Council had possessed authority to dispose of the municipal property at private sale. They could then have said: We will confirm the previous proceedings; we will take the money already advanced, and what is to be advanced upon the bid as the consideration, and transfer the title. But as the power of disposition could only be exercised in one way —by a direct ordinance authorizing a public sale, after due advertisement of the time, place, and terms—no other mode could be adopted in its stead. Appropriation of the proceeds, proceedings. upon the assumed validity of the sale, reference to the ordinance as having been passed, would not answer the requirements of the charter. The Common Council were not invested with any discretion to substitute a different mode for the disposition of the city's property in the place of the one provided."

In some of the actions against the city, the restraining clause of the charter of 1851 against the incurring of debts or liabilities exceeding in the aggregate, with former debts or liabilities, the sum of fifty thousand dollars, has been relied upon. This clause was the subject of extended consideration in the McCracken case, and we held that it referred to the acts or contracts of the city, and not to liabilities which the law cast upon her; that it was intended to restrain extravagant expenditures of the public moneys, and not to justify the detention of the property of her citizens, which she had obtained without authority of law. Her liability in this respect, we said, was independent of the restraining clause; "and it may be well doubted," we continued, "whether it would be competent for the Legislature to exempt the city, any more than private individuals, from liability under circumstances of this character. Suppose, for example, that the city should recover judgment against an individual for $100,000, and collect the money upon execution, and upon appeal, the judgment should be reversed, would it be pretended that the money could not afterwards be recovered? Could the city defend against the claim for restitution upon the pretense that she was already indebted over $50,000? Could she, to use the language of counsel, *owe herself out of liability?* Suppose, again,

an individual should pay the taxes upon his property, in ignorance that they had already been paid by his agent, could the city retain the amount thus paid by mistake ? Could she plead her previous indebtedness as an excuse for the detention of the money to which she had no legal or equitable right ? Suppose, again, the city should neglect to keep the streets in repair, and an individual should be injured in consequence—should break his leg, or be otherwise crippled—could she allege her insolvency against his claim for damages ? Would her pecuniary condition be an answer for the neglect of every duty, legal and moral ? If this were so, she would be the most irresponsible corporation on earth, and her treasury would be, in many instances, but a receptacle for others' property, without possibility of restitution. The truth is, there is no such exemption from liability on her part. The same obligations to do justice rest upon her as rest upon individuals. She cannot appropriate to her own use the property of others, and screen herself from responsibility upon any pretense of excessive indebtedness."

As will be seen from this brief statement of the questions settled in the several cases heretofore before the Court, there is nothing to prevent a recovery of the claimants in the alleged want of privity between the bidders and the city, or in the alleged subsequent adoption of the ordinance providing for the sale, or in the alleged ratification of the sale, or in the restraining clause of the charter. The several cases stand simply upon this ground : The city has obtained the money of her citizens without any consideration, under a mistaken impression of her rights, and has appropriated it to municipal purposes ; and they insist, and so we have held, that she is, under these circumstances, bound, both legally and morally, to refund it to them.

The suggestion, frequently made in the cases, that the claimants are taking advantage of a mere technical defect, and that had they remained contented with the sale they would not have been disturbed in their possession, is without force. That defect which vitiates entirely a sale, and leaves the title of the property in the city, can hardly be termed a technical one. It is a defect which goes to the substance of the whole transaction. Nor is it by any means cer-

tain that the bidders would have been left in undisturbed possession of the property had no question as to the validity of the alleged sale been raised. They could have no assurance that subsequent corporate authorities might not claim the property; or if the authorities did not move in the matter, that the creditors of the city might not attempt to subject the property to the satisfaction of their demands. But, independently of these considerations, it is enough to say that the bidders had a clear right to ask for a return of their money when they found that the title had not passed to them and could not pass by the proceedings taken. They were not under any obligation to wait a moment. The money was paid for a present not a future transfer of the title. But the bidders were more indulgent than this. It appears from the findings in one of the actions—*Grogan* v. *San Francisco* (18 Cal. 597)—that in January, 1855, they became aware of the invalidity of the sale, and apprised the then Common Council of the city of its invalidity, and requested them to pass an ordinance ratifying and confirming the sale, which they refused to do. It is true that the Common Council did not possess the power to ratify and confirm the sale, but they could have applied to the Legislature then in session for the power. No steps of the kind were, however, taken. There was only one alternative left to the bidders—to institute suits for the recovery of their money, which they subsequently did. Again, in 1858 the Legislature passed an act authorizing the Treasurer of the city to execute deeds to the purchasers upon receiving the balance, if any remained unpaid, of the original bids; and provided that such deeds should convey the right, title, and interest, both of the city and of the city and county, in the property. But this act the city neglected to accept, and without her acceptance it never acquired any force or efficacy whatever. It undertook to divest the city of her property upon conditions imposed by the Legislature, and not by herself. The conveyances of the Treasurer under the act, were, therefore, inoperative to pass any interest, and the title to the property remained as before in the corporation. (*Grogan* v. *San Francisco*, 18 Cal. 590.)

In the present case the city sets up as a bar to the plaintiffs' recovery the Statute of Limitations. With the policy of a defense

Pimental *v.* City of San Francisco.

of this character on the part of the city we have nothing to do. The defense is a legal one, and our duty ends with a determination whether or not it has been sustained. The action is for the recovery of $7,900, paid upon the alleged sale of one of the parcels of the slip property. The complaint alleges, that $1,975 were paid on the twenty-seventh of December, 1853; $3,950 on the twenty-seventh of February, 1854; and the balance, $1,975, on the twenty-seventh of April, 1854; and that these several sums were received by the city on the respective days of their payment. The referee finds that the several payments were made to the city, and accepted by her as alleged in the complaint. In the other actions, which have been before this Court growing out of the alleged sale, it has appeared that the moneys were in the first instance paid to the Mayor and Land Committee, and by them paid into the treasury of the city, on or about the twenty-eighth of April, 1854. The payment at this date does not appear to have been proved in the present case. The defense is, therefore, sustained as to the first two installments, and is not sustained as to the third. The complaint was filed on the twenty-first of April, 1856, more than two years after the payment of the first two sums, and within two years after the payment of the last sum. The statute was a bar after two years from the receipt of the moneys by the city. Whether that receipt must be evidenced by a refusal to refund the moneys, or their appropriation to municipal purposes, it is not necessary to express any opinion. The allegation and the finding are both that they were received by the city at the several dates designated.

The position that the filing of the complaint, without the issuance of summons thereon, did not prevent the statute running, is not tenable. At common law there was no limitation to the period within which actions could be commenced, though a presumption was created that the claim was satisfied by the lapse of twenty years. It is the statute which prescribes the limitation; and in this State the same statute declares that an action shall be deemed commenced, within its meaning, " when the complaint has been filed in the proper Court." It was certainly within the legislative power to affix this qualification upon the provisions of the statute, though

grave considerations as to its policy may be presented, as they have been by the learned counsel of the appellant in the present case. (*Sharp* v. *Maguire*, 19 Cal. 597.)

Judgment reversed and cause remanded for a new trial.