BECKWITH, (HALDERMAN v.) See Case No. 5,907.

---

## Case No. 1,213.

### BECKWITH v. RACINE et al.
### CORNELL v. SAME.

[7 Biss. 142.][1]

Circuit Court, E. D. Wisconsin. April Term, 1876.[2]

LEGISLATIVE CONTROL OVER MUNICIPAL CORPORATIONS—EQUITABLE ENFORCEMENT OF CONTRACT.

1. Counties and towns are, as to their corporate existence, completely within the control of the legislature. They may be changed, altered, diminished or extinguished, by the mere act of the legislature.

[Cited in Mt. Pleasant v. Beckwith, 100 U. S. 535.]

[See note at end of case.]

2. When a town is thus obliterated, an action at law cannot be maintained against it, for it cannot be served by process through its officers, for although the officers of a municipal corporation hold until their successors are elected and qualified, still where no successors could be elected, they cease to hold.

[See note at end of case.]

3. A contract entered into previously, is not destroyed and annulled by the obliteration of the town, for the power of taxation still remains. It is only transferred to other corporations.

[Cited in Garrett v. City of Memphis, 5 Fed. 869.]

[See note at end of case.]

4. When a contract cannot be enforced at law, if there is any fund to which the creditor has a right to resort for the enforcement or payment of that contract, it will be followed by a court of equity.

[See note at end of case.]

5. Where a municipal corporation is legislated out of existence, and its territory assigned to other municipal corporations, the latter must pay the existing debt of the former in the ratio of the amount of territory each obtained.

[See note at end of case.]

[In equity. Bill by Charles Beckwith against the city of Racine, the town of Mt. Pleasant, and the town of Caledonia, and by Latham Cornell against the same, to recover on certain bonds of the town of Racine. Decree for complainants.

[The town of Mt. Pleasant and the town of Caledonia subsequently appealed to the

---

[1] [Reported by Josiah H. Bissell, Esq., and here reprinted by permission.]

[2] [Affirmed by the supreme court in Mt. Pleasant v. Beckwith, 100 U. S. 514.]

supreme court, which affirmed the decree in Mt. Pleasant v. Beckwith, 100 U. S. 514.]

Fuller & Winslow, for complainants.

Fish & Lee and Jenkins, Elliot & Winkler, for defendants.

Before DRUMMOND, Circuit Judge, and DYER, District Judge.

DRUMMOND, Circuit Judge. On the 2nd of April, 1853, the legislature of this state passed an act to authorize certain towns to aid in the construction of the Racine, Janesville and Mississippi Railroad. [Sess. Laws Wis. 1853, p. 11.]

By that act, the town of Racine was authorized to subscribe $50,000 to this railroad. The third section of the act declares, "that the board of supervisors of the towns whenever the same shall become necessary, shall annually levy a tax upon the taxable property of the town, sufficient to pay the interest upon the bonds, which may be issued as a part of the subscription, after deducting the dividends due to the towns on the shares of the stock."

The stock was subscribed to this amount by the town of Racine, and bonds were issued, and those bonds, according to the allegations in the bill, have come into the hands of the respective plaintiffs for value; they have become, therefore, bona fide holders.

By various enactments of the legislature, subsequent to 1853, which it is not necessary to follow in detail, the town of Racine, which was authorized to subscribe this amount of stock to the railroad, was obliterated in name, and the territory which in 1853 was within the limits of the town of Racine, is now included, or was at the time these bills were filed, in the towns of Mount Pleasant and Caledonia, and the city of Racine. And the question is, what is the effect upon the rights of the plaintiff of this legislation in thus obliterating the town of Racine and bringing within the limits of the towns of Mount Pleasant and Caledonia and the city of Racine, the territory that was in 1853 comprehended within the town of Racine. In relation to those bonds, has the obligation of the contract thus made by the town of Racine been destroyed or even impaired? We think that it has not.

It is not claimed on the part of the defense that there is not a liability, or may not be, but it is insisted that whatever liability exists, is at law; and these being bills in equity, and there being a plain and adequate remedy at law, according to well settled principles, the bills in equity cannot be sustained. If the town of Racine were in existence, and could be sued, how much soever its territorial limits might have been modified, changed or curtailed by acts of the original parties since 1853, then it might be said that there would be a complete remedy at law, because under such circumstances the town

of Racine supposed to be existing as a corporation, would be subject to suit; process could be served upon it, and it could be brought into court. But can that be done now? It is said that inasmuch as the constitution of the United States protects all contracts and prevents any legislation of a state which tends to impair them, for the purpose of enforcing them a corporation must be presumed still to exist, and subject to process; and so an action can be brought against it. If that is so, these bills cannot be maintained; but is that so in point of law and fact? We think it is not.

Counties and towns, are, as to their corporate existence, completely within the control of the legislature. They may be changed, altered, enlarged, diminished or extinguished by the mere act of the legislature. They are absolutely within the legislative control, and there can be no question of the power of the legislature to change or alter the town of Racine, and so to speak, annihilate it as a town or a corporation; and the question is when this is done, is there anybody, any. entity in esse that can be sued.

One of the attributes of a corporation is that it can sue and be sued. If a corporation does not exist, how can it sue? It will be admitted that it cannot sue. How can it be sued? Manifestly upon no other ground than that a contract has not been impaired, and there must be a way of enforcing it, and the corporation must still exist for the purpose of suit and enforcement of the contract. Obviously that cannot be so, unless there is some law in existence which creates and continues corporate functions for that purpose; which clothes some persons naturally or artificially with a capacity to be served with process, and brought into court, and to appear by counsel. It is said that by operation of law and in conformity with express enactments, the officers of corporations, of counties and towns continue in existence until their successors are elected and qualified; and inasmuch as in this case, when this town was obliterated by the fiat of the legislature and ceased to exist as a town, there were officers of the corporation in existence; that they have continued to exist as such officers up to the present time; and would as long as there was in existence a contract which could be enforced against a town.

Now, it is, I believe, about 14 years since there was a town of Racine. It is perfectly clear to me that the act of the legislature which is referred to, does not contemplate such a case as this when it declares that the officers of a municipal corporation shall continue in existence until their successors are elected and qualified.

In this case there could be no successors elected or qualified, because the capacity to elect had ceased to exist. And it certainly can only refer to cases where that could be done. Therefore, it seems to me that the conclusion is irresistible, that in this case, these officers did not continue to hold an office to which successors can be elected or qualified.

The act of the legislature contemplates, and it necessarily implies, the continued existence of the corporation; therefore there is no person upon whom service can be had in an action at law, because there is no corporation in existence for the purpose of maintaining a suit at law.

Then the next point is, whether the contract has been destroyed because the legislature has destroyed the corporation. We think it has not. The act of 1853 declares that the interest upon these bonds should be paid in a particular way by the imposition of a tax upon the property at that time within the limits of the town of Racine. That was the fund which was provided for the payment of these bonds, or at any rate of the interest on the bonds; therefore, the creditor had a right to look to the taxing power of the town as his means of payment.

Now, the power of taxation which then existed, and which was recognized in the act of 1853 as the means of enforcing the payment of the debt which might be created is not gone, it has only been transferred to different municipal corporations. Whatever may be said of the personal property, the real, fixed property which could then be resorted to to pay this debt is still there, and the power of taxation still exists.

It is a well recognized principle in equity, as a contract cannot be impaired, that where there is any fund to which the creditor has a right to resort for the enforcement or payment of the contract, it will be followed by a court of equity. It would be a reproach to the jurisprudence of this country, where the principle in the fundamental law of this Union is that no state can pass a law impairing the obligation of a contract, if it were allowed to be impaired or destroyed, simply by the change of boundaries of a town, or by striking out the name of one town and putting in the name of another; by the town of Racine ceasing to exist under legislative enactments, and Mount Pleasant and Caledonia and the city of Racine being substituted in its place.

Then this being so, that the contract still exists, and that a court of equity will enforce it, the question is, whether this is in the predicament of some of the cases that have been referred to, and particularly of the case decided by the supreme court of the United States, where it is said that there are many contracts which cannot be enforced, that there are many debts existing which can never be paid, and therefore, there may be the right without a remedy. I do not think that this case comes within that category. If there were nothing to which the creditor had the right to resort to enforce his contract, it might be so, like the case of the individual who is stripped completely of all means to pay a debt. There is a judgment,

or decree, but the fault is not then in the law; it is because there is nothing which the party has to meet the decree, or satisfy it.

It may be conceded that there are some difficulties connected with the details of such a case as this, and a court of equity possibly in carrying out the objects sought in whole or in part by these bills, may meet with some obstacles in enforcing the obligations of the town of Racine; but it is to be hoped they will be met and overcome. If that cannot be done, it would be a very hard case for the creditors of our municipal towns and corporations, and particularly in this state, because all that it would be necessary to do would be simply for the legislature to pass a law changing all those municipal corporations, making others in their stead and making new boundaries, and in that way some municipalities could get rid of debts which they are now trying to avoid in ways not much more creditable. I do not think that that can be done.

The counsel for the defendant insists that the remedy can only be pursued after a judgment has been obtained at law. His sense of justice and equity revolts at the idea of there being no remedy; but he says it must first be sought in an action at law. I have already stated the reasons why I think that cannot be done.

The principles declared in the case of Curran v. Arkansas, 15 How. [56 U. S.] 304, I think substantially dispose of most of the material questions in this case. It is true in that case the bank charter was not absolutely repealed, and it was undoubtedly competent to enforce the rights of creditors against a fund which the state had undertaken to control in derogation of their rights. But while that case declares that it is competent for the legislature to dissolve a corporation, it asserts that the dissolution of the corporation does not impair the obligation of the contract, and that a court of equity can enforce the contract by any of the various means within its power. There is one remark made by the court which, although it does not absolutely decide this question, still it is clear it was in the mind of the court. The court says, that whatever technical difficulties exist in maintaining the action at law by or against a corporation after its charter has been repealed, in the apprehension of a court of equity there is no difficulty in the creditor following the property of the corporation into the hands of any one not a bona fide holder.

It is true that was a bank, but as I have already stated, the control of the legislature over municipal corporations is absolute; and the fact that that was a bank, and this is a town can certainly make no difference. All the technical difficulties in the way of the maintainance of a suit at law, which are referred to by the court in that case, seem to be insurmountable. In fact, I think that it would be found that the counsel for the defense, if these parties had been sued at law,

would have objected that no suit at law could be maintained against the town of Racine.

I have said that the power of taxation has not been annihilated. It still exists; it has only been transferred, and as at present advised, I should be inclined to think that it would be competent for the court to apportion this indebtedness among these various defendants in such a way as to make each one of them answerable in proportion to the fund that has come within its control for the payment of this debt. I do not say that that will ultimately be the view which the court may take of it; but as at present advised, I feel inclined so to hold. At any rate, it is clear to my mind that there must be some way by which those parties who have control of this fund, which the legislature set apart for the payment of this debt, can be made answerable for it. Therefore, the demurrer will be overruled. The defendants may have reasonable time to answer.

On the final hearing of the cause, the following was the opinion of the court:

DRUMMOND, Circuit Judge. When these cases were submitted on the demurrer, the court stated its general conclusions on the law, and I see no reason to doubt the correctness of the conclusions then reached. The two cases are substantially alike. They have been presented to a master, who has taken proof, and they have come up now for final hearing, but whether or not the report of the master may be of such a character as to entitle the parties to a decree may be questionable, but there probably can be an arrangement made between counsel by which a decree can be prepared after hearing the opinion of the court. I think the plaintiffs are entitled to a decree.

When the bonds were issued on the 6th of December, 1853, as well as when the act under which they were issued was passed, April 2d of the same year, the town of Racine consisted of all of fractional towns 3 and 4 of range 23, except what was within the limits of the city of Racine, and comprehended not far from thirty sections of land. It was bounded on the west by the towns of Caledonia and of Mount Pleasant, and on the east by Lake Michigan. In 1856 the boundaries of Mount Pleasant were extended to the lake, so as to include nearly one half of the town of Racine, thus cutting off the whole of the south part of the town, and including it within the limits of the town of Mount Pleasant. In 1857 the boundaries of the town were again changed. Caledonia and Mount Pleasant were both extended to the lake, and Racine was left lying between those towns, Caledonia on the north, and Mount Pleasant on the south, the boundaries of Racine being extended from the lake to the western boundary of range 22, being four sections in width north and south, and thus constituted, Racine comprehended, on the east about twelve sections, which it had in 1853, and took in on

the west what was then a part of Mount Pleasant, and of Caledonia, being twelve sections from each town. With these boundaries the name of Racine was changed to Orwell. In 1860, the town of Orwell was vacated and all of its territory attached to the towns of Caledonia and Mount Pleasant; thus Racine, or Orwell, ceased to exist as an organized town. In 1871, there was added to the city of Racine a small part, namely, two or three sections of what was then Mount Pleasant, and of what was a part of that town and of Racine or Orwell in 1857, and a part of Mount Pleasant and of Racine in 1856, and a part of Racine in 1853. The various changes are marked on the plans of the town, which are given by the master in his report of the testimony. This was the condition of the towns and the city of Racine when the bill was filed, and the question is, what are the rights of the parties?

I have already said that it was not competent for the legislature to impair the obligation of the contract made by the town of Racine, as it existed in 1853; when the subscription was made to the railroad stock, and the bonds issued. There was a contract between the parties which could not be affected by any subsequent legislation. When the town, by legislation, was brought within much narrower limits, what was the status of the case when this change was made? I think, according to well settled principles, it must be understood, no legislation being had in relation to the debts of the town, and Racine being left with these curtailed limits, the debt of Racine followed the town. The newly constructed Mount Pleasant, although it had taken in a portion of the old town of Racine, was not required to pay its debt, or any portion of it; it took, therefore, the territory from Racine, without the liability arising from its indebtedness, and the debt remained fastened upon the town of Racine, as it was then bounded. If that is so, what was the condition of affairs when these boundaries were changed, and Caledonia and Mount Pleasant were both extended to the lake, and Racine was left a strip of land four sections in width, from the lake to the western boundary of range 22? It had thus taken in a portion of the old town of Racine, and also a portion of Caledonia and Mount Pleasant, and the north portion of the town of Racine was cut off, and placed within the territorial limits of Caledonia. There had yet been no legislation in relation to the indebtedness of the town of Racine, and I think the indebtedness was cast upon the town of Racine as thus newly constructed by the act of the legislature. A portion of the old territory was taken within the limits of the town; it had taken in also a portion of both Caledonia and Mount Pleasant. It thus had additional territory which it had not in 1853, from which it might be enabled to pay the debts it had then created, but the law of

the case is, as I understand, the territorial limits of a town being absolutely within the control of the legislature, it was competent for it to change or alter in any respect, to diminish or add to, the territorial limits of the town, and nothing being said about any indebtedness the debt followed the town as thus newly constructed, whether diminished or enlarged. When the town of Racine had thus been created by the act of the legislature, and the name of the town changed to Orwell, that change of name could not affect the rights of the parties. The obligations of the town still existed, and when Caledonia, Racine or Orwell and Mount Pleasant were created—Caledonia on the north, Mount Pleasant on the south, Racine in the middle, extending from the western boundary of range 22 to the lake—then it was with the indebtedness of Racine, as created in 1853, or of Orwell, as it was subsequently called. This, then, was the position of the case when some important legislation took place upon the subject, and, as it has been stated, in 1860, Orwell ceased to be an organization, and its whole territory was annexed part to Caledonia, and part to Mount Pleasant; then, and afterwards, there ceased to be a corporation municipal which was liable to the plaintiff for the former indebtedness of Racine; and there existed only the corporations of Caledonia and Mount Pleasant. According to the view I take of the case, this circumstance did not impair or destroy the indebtedness of Racine; it was not competent, as I have stated before, for the legislature thus to put an end to the indebtedness. If that had been attempted, it certainly would have been unconstitutional legislation; so that I think Caledonia and Mount Pleasant having taken, as corporations, the territorial limits of what was formerly Racine, or Orwell, must equitably be held to be responsible for its debt. Having taken all the means by which the town of Racine could pay its indebtedness, it must be held that they stand in the place of Racine, and liable for the same. And we cannot take one and leave out the other, because by the same act of legislation the territory of Racine was attached part to one, and part to the other, operating therefore at the same time and upon both towns, and as the debt was against the town of Orwell at the last moment that it ceased to exist as a town, it was then transferred equitably to Caledonia, and to Mount Pleasant. Then in 1871 there was an addition made to the city of Racine. Between two and three sections of land were added to the city and taken from Mount Pleasant.

The act which thus added to the limits of Racine, declared that it should be liable, (there seems now a new element in the legislation, and that there must be some provision made for the debt of the town of Racine,) to pay the debts of the town of Racine in proportion to the territory which it

took, so here we have an act of legislation which makes it incumbent upon the city of Racine to pay its proportion of the indebtedness. If these principles are correct, the city of Racine being obliged by the express term of the law to pay a portion of the indebtedness, and the towns of Caledonia and Mount Pleasant being also obliged, from the nature of the case, the only question is: How is the division to be made between these respective corporations? and it seems to me that it can only be made upon the proportion of territory which each of the towns took from Orwell.

Now the act of 1853 in authorizing the indebtedness of the town of Racine, declared that provision should be made by a tax upon the property of the town to pay the interest on the indebtedness. It did not say in terms, real estate, but upon the property; and it might be presumed to include both personal and real property. But it is obvious, I think, that it is impracticable, in the nature of things, for the court to determine the amount of personal property that may have been taken off from the town of Orwell by Caledonia, or by Mount Pleasant, and it seems to me that the only satisfactory method of determining the part of each is that the debt shall be apportioned according to the territory that each took from the town of Orwell.

A case has been recently decided by the supreme court of the United States, (Laramie Co. v. Albany Co., 92 U. S. 307,) the principle of which is, as it has been stated by the court, that when an indebtedness is created by a municipal corporation, and there are created out of that corporation new corporations, such as counties or towns, the debt of the old corporation follows it within the new territorial limits, and the new municipal corporations are not bound to pay any portion of the indebtedness unless the act of division so prescribes. In that decision this language is quoted and approved by the supreme court, in referring to the case of Bristol v. New Chester, 3 N. H. 534, as to the power to divide towns—"The power in that regard is strictly legislative; and that the power to prescribe the rule by which a division of the property of the old town shall be divided, is incident to the power to divide the territory. * * * Such a decision must be founded upon the circumstances of each particular case."

Now that principle, it seems to me, applies to the peculiar circumstances of this case, and that the division must be made as I have suggested, namely: Caledonia must pay in proportion to the territory that it has taken from Orwell, and so must Mount Pleasant, and the city of Racine in proportion to the territory that it has taken, as prescribed by the act of the legislature.

[NOTE. On appeal to the supreme court by the town of Mt. Pleasant and the town of Caledonia, the decree of the circuit court was affirmed, the court taking the ground that where the charter of one municipal corporation is vacated, and the whole of its territory annexed to two others, the two enlarged corporations will, in the absence of any legislative provisions, be entitled to all the public property of the one that ceases to exist, and they will become liable for all the legal debts contracted prior to the annexation. In delivering the opinion of the court, Mr. Justice Clifford referred to the act of March 17, 1871, which set off from the town of Mt. Pleasant, and annexed to the city of Racine, a portion of the territory formerly belonging to the old town of Racine, saying: "Enough appears in that provision of direct legislation to show that the city of Racine was thereby made liable for the debts of the extinguished town of Racine in the proportion therein described, and the clear inference from the provision is that the town of Mount Pleasant, prior to the passage of that act, was liable for the debts of that old municipality, in proportion to the whole extent of the territory annexed to her by the prior act, which extinguished the old municipal corporation." Mt. Pleasant v. Beckwith, 100 U. S. 514. See, also, Barkley v. Levee Com'rs, 93 U. S. 258; Broughton v. Pensacola, Id. 266; Meriwether v. Garrett, 102 U. S. 472; Grantland v. City of Memphis, 12 Fed. 287; Brewis v. City of Duluth, 9 Fed. 747.]