ROBERT GARRETT & SONS and others *v.* THE CITY OF MEMPHIS and others.

*(Circuit Court, W. D. Tennessee.)*

1. TAXES—MUNICIPAL DEBTS—REPEAL OF CHARTER—RECEIVER.

Question discussed whether taxes duly levied in pursuance of law, before a repeal of a municipal charter, can be collected by a chancery court, through a receiver, at the instance and for the benefit of creditors.

2. MUNICIPAL DEBTS—LEGISLATIVE POWERS.

Question discussed as to the powers of the legislatures of the states to enact laws by and under which municipalities can be legislated beyond the authority of the courts, and thus enabled to evade their past and valid contract obligations.—[ED.

In Equity.

BAXTER, C. J. The late city of Memphis, a municipal corporation created by a statute of Tennessee, was endowed with the powers usually conferred on such corporations. Among others, it was invested with the capacity to contract debts and to levy and collect taxes for their payment. Availing itself of its power to contract debts, it incurred valid obligations aggregating more than $5,000,000. On some of these, suits were brought and judgment recovered; and on these judgments executions were issued, which, after diligent efforts to collect, were returned unsatisfied. These executions were followed by writs of *mandamus,* commanding the proper officers of the city to levy and collect taxes sufficient to pay said judgments; but these, like the executions, proved unavailing, and therefore Garrett & Sons filed their bill on the twenty-eighth of January, 1879, in this court, in which they prayed for the appointment of a receiver "to take charge of

the assets of said city, including its tax books and bills for past-due and unpaid taxes," and for an order "clothing him with all proper powers to enable him to collect the same."

This application was predicated on section 3 of the "Act to enable municipal corporations, having more than 30,000 inhabitants, to settle their indebtedness," of the twenty-third of March, 1877, which provides "that upon the application of any person or persons who are the owners of any past-due and unpaid bonds, coupons, or other indebtedness of a municipal corporation, not less in amount than $100,000, it shall be the duty of the chancery court to appoint a receiver for said municipal corporation, who, as the officer of the court, and not otherwise, should, under the order and instruction of the court, act for such municipal corporation."

Adopting substantially the language of this enactment, complainants charge that they "are the owners and holders of past-due and unpaid bonds and coupons and other indebtedness of said city to the amount of more than $100,000," and that "on much of said indebtedness" they had recovered judgments and obtained writs of *mandamus* to compel payment, etc.; but "that the officers of said city, whose duty it was to levy and collect the taxes assessed, in obedience to said *mandamuses*, had failed to collect the same, and that the defendant had, through its officers, constantly connived at said delinquency," thus bringing their case clearly within the provisions of said third section. But on the day succeeding the filing of complainant's bill, to-wit, on the twenty-ninth of January, 1879, and before any action was had thereon, the legislature passed two acts,—one to repeal the defendant's charter, and the other to organize the same population and territory into another municipality by the corporate name of "Taxing District." Now, if the authority to levy and collect taxes for municipal purposes, usual in such charters, had been conferred on the taxing district, the latter municipality might have been proceeded against as the successor of the former, and compelled to assess and collect taxes for the payment of complainant's judgment. But this point was thoughtfully guarded by the acts in question. The

first, after repealing the city's charter and declaring that the population within the territorial limits thereof should be "resolved back into the body of the state," enacts that "all power of taxation, in any form whatever, heretofore vested in or exercised by the authorities of said (repealed) municipality * * * is forever withdrawn and reserved to the legislature." And in harmony with this declaration, the act creating the taxing district provided that "the necessary taxes for the support of the government therein established (the taxing district) shall be imposed directly by the general assembly of the state of Tennessee, and not otherwise." And, as a further means of putting the taxing district beyond the power of the courts, said act declared "that all the officers and agents employed in the administration of said local government shall be the officers and agents of the state, so far as all their official acts, touching said government, are concerned."

And said act further provides "that the fire-engines, hose and carriages, horses and wagons, engine-houses, public buildings, public squares, parks, promenades, wharves, streets, alleys, engineer instruments, and all other property, real and personal, hitherto used by said government for the purposes of government," should be transferred to the board of commissioners of the taxing district, to remain, as heretofore, public property for the public use, and that all indebtedness for taxes or otherwise, due to said extinct municipality, should "vest in and become the property of the state, to be disposed of for the settlement of the debts of said municipality," as should be thereafter provided by law.

These enactments necessitated an amended and supplemental bill, which was accordingly filed. Other creditors of the city filed similar bills, seeking the same relief, which were, on motion and by consent of the parties, consolidated, and ordered to be heard together with the suit of Garrett & Sons. After being thus consolidated, the application for the appointment of a receiver came on, to be heard on the twelfth of February, 1879, when the aforesaid acts were urged in argument as a full and sufficient defence to said motion,

But entertaining the opinion that these acts, in so far as they sought to divest the jurisdiction of this court regularly acquired before their passage, were in conflict with the national and state constitutions, I disregarded their behests, and appointed a receiver.

Therefore, these statutes were soon after supplemented by two other enactments,—the first entitled "An act to amend an act entitled 'An act to establish taxing districts in this state, and to provide the means of local governement for the same;'" and the other, "An act to collect and dispose of the taxes assessed for municipal corporations in this state, whose charters have been repealed, or which may surrender their charters, and to provide for the compromise and making settlement of the debts of such extinct municipal corporations respectively." The former contained many details, in some particulars modifying, and in other respects enlarging, the corporate powers of said taxing district, not material to the present discussion, while the latter authorized and commanded the governement to appoint a "receiver and back-tax collector," to "collect all taxes imposed by said extinct municipalities up to the time of the repeal of their charters." It was made the duty of such receiver and back-tax collector, when appointed, "to take possession of all books, papers, and documents pertaining to the assessment and collection of taxes" embraced in the act, and to accept payment in the valid debts of such municipalities, with accrued interest, at the following rates: Bonds known as compromise or funded bonds, at par, and all other bonds, scrip, certificates of indebtedness, pastdue coupons, ledger balances, etc., at one-half their full value, and judgments at 55 cents on the dollar; but forbidding said receiver from coercing payment of more than 20 per cent. of the taxes due in any one year.

The act contained other provisions which need not be recited. Under this act the governor appointed Minor Merriwether receiver and back-tax collector for Memphis. He accepted, entered on the duties imposed on him, and, in his official capacity, became a party to this suit. His appearance as a party introduced new complications and brought

said last two enactments under review. At this juncture, May, 1879, I requested the presence of Mr. Justice Swayne. He came, and advised a certification of the several questions made in the case to the supreme court, and left the district judge and myself to carry out his suggestions. My own views had been previously distinctly announced in a written opinion filed, disposing of an interlocutory motion, and copied into the transcript sent to the supreme court, to be found on pages 301 and 302.

I said: "All this court claims to do is to collect the assets of the late city of Memphis, including taxes regularly levied and not paid, and apply the same to the payment of the complainants and such other creditors as may hereafter make themselves parties to this cause, and show themselves entitled to share in the distribution of said fund." And, in harmony with this explicit declaration, "the public highways of the city, the public squares, the public landings and wharves, the engine-houses, the fire-engines, and the horses belonging to the fire department, the hose, the hose carriages, and the other property and appurtenances of said department, the hospital and property and appurtenances belonging thereto or used in connection therewith, the horses, wagons, tools, and implements and other property used in connection with and necessary to the engineer's department, the property used in connection with the police department of the city, and the taxes heretofore levied for the support of the public schools of the city," were exempt from the operation of the decree appointing the receiver. But as the parties desired to present, in one appeal, all the questions that could possibly arise in the case, they were permitted to incorporate them in the certificate of division; and, thus prepared, it was signed *pro forma*, I declaring from the bench that the decree, in my judgment, went further than the previous adjudication warranted, but that for the purpose of presenting all the questions I would yield to the wishes of the parties, and certify them, to the intent that the judgment of the supreme court might be had thereon. And thereupon the case was, in pursuance of the understanding of the parties, appealed to the

supreme court, where it was decided by a divided court, whose mandate it is my duty to enforce. But the principal question involved is of such far-reaching importance, I am unwilling to finally dispose of it, in accordance with said mandate, without leaving, in a permanent form, a statement of my own views in relation thereto.

This question, broadly stated, involves an inquiry into the powers of the legislatures of the states to enact laws by and under which municipalities can be legislated beyond the authority of the courts, and thus enabled to evade their past and valid contract obligations; but as presented in this record the question is whether taxes duly levied in pursuance of law, before a repeal of a municipal charter, can be collected by a chancery court, through a receiver, at the instance and for the benefit of creditors.

The argument in support of the proposition that a chancery court can, through a receiver, collect such unpaid taxes and apply the same to the payment of the debts of such extinguished municipalities, is concisely and forcibly stated by Mr. Justice Strong in his opinion, delivered in behalf of the minority of the court, in this case. He says: "But while, in these particulars and for these reasons, the decree entered by the circuit court cannot be sustained in its full extent, I am of opinion that the complainants are entitled to some of the relief granted them by the decree. If they are not, then a new way has been discovered to pay old debts. It cannot be that a corporation, whether municipal or not, can be dissolved, and that by dissolution its property can be withdrawn from the reach of its just creditors by any process of law or equity. No doubt there are technical difficulties in the way of maintaining proceedings at law against a corporation after its charter has been repealed, but a court of equity is competent to enforce justice, to some extent, even where the process of law fails."

A case, I think, was made by the bill for the appointment of a receiver to take into the possession of the court those taxes which had been levied by judicial direction for the payment of judgments recovered against the city—taxes which

had been only partially collected. Those taxes were, in a most legitimate sense, charged with a trust, and a trust for the complainants. The fund to be raised by the levies was set apart for a special purpose. It could be used lawfully for no other. The ordinances which directed the levies specified the amounts to be raised, and the judgment creditors for whose use the levies were made. Those creditors were, therefore, *cestuis que trust* in the fullest sense of the term, the legal interest alone being in the city. The case shows that this trust had been neglected and abused by the trustee. The taxes which it was the duty of the city as trustee to collect had been suffered to remain uncollected in great measure, and for an unreasonable time, and even the portions which were collected had not been paid over, as the writs of *mandamus* required. This breach of duty by the trustee had continued from 1875 to 1879. Had the trustee been a natural person, or a private corporation, no one would doubt the power of a court of equity to interfere and take the trust out of the hands of the faithless trustee, either by removing him and appointing another trustee, or by administering the trust by its own officers. It can make no difference that the city of Memphis was a municipal corporation. Its character as such does not affect the nature of its obligations to its creditors or its *cestuis que trust*, or impair the remedies they would have if the city was a common debtor or trustee. While as a municipal corporation the city had public duties to perform, in contracting debts authorized by the law of its organization, or in performing a private trust, it is regarded by the law as standing on the same footing as a private individual, with the same rights and duties, and with the same liabilities, as attend such persons. Over its public duties, it may be admitted, the legislature has plenary authority. Over its private obligations it has not. *Bailey* v. *The Mayor of New York*, 3 Hill, 539; *Small* v. *Danville*, 51 Me. 361; *Oliver* v. *Worcester*, 120 Mass. 502; Dillon on Municipal Corporations, § 39, and cases cited in the notes.

Moreover, if, as contended by the appellants, the city of Memphis ceased to have any legal existence on the thirty-first

day of January, 1879, when the legislative act repealing the charter was approved, the case then became one of a trust without a trustee, pre-eminently fit for equitable interference. A court of equity will not permit a private trust to fail for want of a trustee; and this rule is applicable to cases in which a municipal corporation has been nominated the trustee. *Girard* v. *Philadelphia*, 7 Wall. 1; *Philadelphia* v. *Fox*, 64 Pa. St. 169; *Montpelier* v. *East Montpelier*, 29 Vt. 12. In such cases, as in cases where a natural person or a private corporation is the trustee, and the person has died, or the corporation has been dissolved, the court will appoint a new trustee, or execute the trust by its own officers or agents.

In Potter on Corporations, § 699, it is said: "Where, in any way, the legal existence of municipal trustees is destroyed by legislative act, a court of equity will assume the execution of the trust, and, if necessary, will appoint new trustees to take charge of the property and carry into effect the trust."

In High on Receivers, 364–365, it is said: "When creditors of a corporation have a charge upon a particular fund in the nature of a trust fund, the mismanagement or waste of such fund by those entrusted with its control will warrant the appointment of a receiver."

So in *Batesville Institute* v. *Kauffman*, 18 Wall. 154, this court, when speaking of the power of the court to appoint a new trustee in place of one deceased, said: "It is, however, within the power of the court of equity to decree and enforce the execution of the trust through its own officers and agents, without the intervention of a new trustee;" citing Story's Equity, 976, 1060.

Without further citations, which might easily be made, enough has been said to show that, in the present case, the circuit court was authorized to seize by the hands of its own receiver, for administration, those taxes which had been levied specially for the payment of judgments recovered, in regard to which the city had occupied the relation of a trustee, at least practically.

Much of what I have said is equally applicable to the taxes

which the city, during its corporate existence, had levied for the payment of interest on its debt, or for other purposes, and had not collected, and generally to all the assets of the city of every character, except such as I have heretofore mentioned, held for strictly public uses, such as public buildings, parks, fire apparatus, etc.   These general assets, though not held specially in trust for any particular creditors, were held by the corporation, in a very just sense, for the benefit of its creditors.   The corporation having ceased to exist, it was perfectly within the power of the circuit court, sitting as a court of equity, to seize all its assets to which its creditors have an equitable or legal claim, and hold them for adminis- tration.   Such assets cannot be appropriated to any other use until the creditors are satisfied.   Even legislative action can- not divert them to other uses.   These principles have been fully recognized, and particularly in the Code of Tennessee. Referring to dissolved corporations, that Code enacts, (section 3426:)   "The court shall appoint a receiver, with full power to take possession of all the debts and property, and sell and dispose of, collect and distribute, the same among the credit- ors and other persons interested, under the orders of the court."   This statute is only an affirmance of equitable rem- edies before acknowledged and found in text-books.   Thus, in Potter on Corporations, §§ 714, 715, the rule is thus stated: "Whatever technical difficulties exist in maintaining an action at law against a corporation after its charter has been repealed, in the apprehension of a court of equity there is no difficulty in the creditor's following the property of the corporation into the hands of one not a *bona fide* creditor or purchaser, assert- ing his lien thereon, and obtaining satisfaction of his debt."

In *Broughton* v. *Pensacola*, 93 U. S. 268, the language of the court was:   "The ancient doctrine that upon the repeal of a private corporation its debts were extinguished, and its real property reverted to its grantors, and its personal prop- erty vested in the state, has been so far modified that a court of equity will now lay hold of the property of a dissolved cor- poration and administer it for the benefit of its creditors, and its contracts may be so far enforced by a court of equity as to

subject for their satisfaction any property possessed by the corporation at the time. In the view of equity, its property constitutes a trust fund pledged to the payment of its debts to creditors. And if a municipal corporation, upon the surrender of its charter, be possessed of any property, a court of equity will equally take possession of it for the benefit of the creditors of the corporation."

So in *Curran* v. *Arkansas*, 15 How. 307, it was said "the assets of a corporation are assets for the payment of its debts, and are trust funds for that purpose." See, also, *Maenhout* v. *New Orleans*, 2 Woods, 112, 114.

In Dillon on Municipal Corporations, § 37, the rule is stated thus: "Where the legal existence of a municipal trustee is destroyed by legislative act, a court of chancery will assume the execution of a trust,   *   *   *   take charge of the property, and carry into effect the trust."

In *Beckwith* v. *Racine*, 7 Biss. 142, the court said: "Where a contract cannot be enforced at law against a municipal corporation, owing to a repeal of its charter, and there are any funds, a court of equity will administer them for the benefit of creditors. It is hardly necessary to say that the private property of a municipal corporation is so decidedly stamped with a trust in favor of its creditors that it is incapable of being diverted to other uses by the legislation of the state. This law has again and again been declared." *Grogan* v. *San Francisco*, 18 Cal. 613, by *Field*, J.; *Com'rs* v. *Detroit*, 28 Mich. 236; *City of Dubuque* v. *Ill. Cent. R. Co.* 67, 68.

The citations I have made (many others might be added) are sufficient to maintain the jurisdiction of the circuit court in this case, and its power to lay hold, by its receiver, of all the property and assets belonging to the city of Memphis when its charter was repealed, including all taxes levied and collected, but undisposed of, and all taxes uncollected, all property purchased by the city in sales for taxes, and all assets of every description, except the property above mentioned held for strictly public uses, and also to administer such assets for the benefit of the creditors.

I do not contend that a court of equity can itself levy a tax. I agree it cannot, and so this court has decided. *Rees* v. *Watertown,* 19 Wall. *supra.* The argument which has been submitted to prove that the circuit court has no such power is quite unnecessary. It is inapplicable to the case we have in hand. The complainants' bill asked for no assessment or levy of a tax, and the circuit court decreed none. The levy of a tax is a very distinct thing from the collection of a tax already levied. The levy is generally a legislative or a *quasi-*judicial act. The collection of a tax after it has been levied is a ministerial act, which a court has power to enforce.

I have said, and I earnestly maintain, that the taxes which the city of Memphis had levied before the repeal of its charter, some of which were collected, but remained on deposit or undisposed of, and some of which are not collected, are assets of the corporation, which its creditors have an equitable right to have seized and appropriated to the payment of the corporate debts. By the lawful assessment and levy of a tax the tax payer becomes a debtor to the municipality, and the debt may be recovered, like other debts, by a suit at law; or, when it is a lien, by a bill in equity. Such, certainly, is the law in Tennessee. *Jonesboro* v. *McKee,* 2 Yerger, 170; *Rutledge* v. *Fogg,* 3 Cold. 568; *Marr* v. *The Bank of Tennessee,* 4 Cold. 487. The imposition of a tax creates a legal obligation to pay. In *The Dollar Savings Bank* v. *The United States,* 19 Wall. 227, this court ruled that, independently of an act of congress authorizing them, suits at law may be maintained by the United States to recover taxes assessed and levied. The statutes of Tennessee leave the matter in no doubt, so far as it relates to the rule in that state. And in the Civil Code, §§ 554, 555, it is enacted that assessed taxes shall be and remain liens upon all taxable property of the person against whom they are assessed. If they are liens, they are enforceable in equity.

It is passing strange if those claims, which, by the law of the state are debts due to the city and collectible as such by the ordinary processes of law, are not assets of the corporation for the payment of its debts. And if they can be col-

lected in the state courts, I am unable to see why the circuit court of the United States, sitting in Tennessee, and having jurisdiction, may not also collect them or seize them as assets of an insolvent and dissolved corporation. I cannot perceive why they are not as truly assets of the city as are the assessments made by an insolvent mutual insurance company its assets. Nobody would deny that such assessments could be seized by a court of equity, through the agency of its receiver, and administered for the benefit of the creditors of the company. No difficulty would be found in the way of collecting them.

Thus far I have considered the merits of the case as unaffected by the legislation of the state heretofore spoken of, except so far as that legislation repealed the charter of the city. That legislation was certainly very extraordinary and quite unprecedented in the history of the country since the federal constitution was adopted. Whatever may have been its purpose, and however carefully that purpose may have been disguised, if it can be sustained, its *effect* is to obstruct, if not totally destroy, all the power of the creditors of the city to enforce payment of the debts due them. They are remanded to the mere grace and favor of the legislature. If ever legislation impaired the obligation of contracts, this did. If it had been simply the repeal of the municipal charter, no one could have called it in question. Undoubtedly the legislature of a state may amend or dissolve the organization of a municipal corporation, so far as its governmental powers are concerned. But no legislature can so dissolve a corporation, municipal or private, as to destroy or impair the obligation of any contracts the corporation may have made. Dillon on Mun. Corp. § 114; *Von Hoffman* v. *The City of Quincy*, 4 Wall. 535. Creditors of municipal corporations are as completely within the protection of the constitution as any other creditors. What is meant by "impairing the obligation of a contract" is well defined. Embarrassments thrown by a statute in the way of enforcing payment of a debt, or a statutory substitution for the obligation and liability of the debtor of the will of some other person, though that

person be a state, have not heretofore been recognized as consistent with the constitution. The protection afforded by its provisions, and its prohibition of certain state legislation, relate, not to the mode and form of state statutes, but to their operation or effect.

Per *contra*, Justice Field, in behalf of the majority of the court, says: "The ancient doctrine that, upon the repeal of a private corporation, its debts were extinguished, and its real property reverted to its grantors and its personal property vested in the state, has been so far modified by modern adjudications that a court of equity will now lay hold of the property of a dissolved corporation and administer it for the benefit of its creditors and stockholders. The obligation of contracts, made whilst the corporation was in existence, survives its dissolution, and the contracts may be enforced by a court of equity, so far as to subject for their satisfaction any property possessed by the corporation at the time. In the view of equity, its property constitutes a trust fund, pledged to the payment of the debts of creditors and stockholders; and if a *municipal corporation,* upon the surrender or extinction in any other way of its charter, is possessed of any property, *a court of equity will equally take possession of it for the benefit of the creditors of the corporation.*" But, after to this extent concurring with Mr. Justice Strong, he proceeded to say "that taxes previously levied but not collected" do not, on the dissolution of a municipal corporation, "constitute its property," which, in the absence of statutory authority, can be collected by a court of equity through its own officers and applied to the payment of the creditors of the corporation. And in support of this view he says "taxes are imposts, levied for the support of the government, or for some special purpose authorized by it," and, having been levied only by the authority of the legislature, "they can be *altered, postponed, or released at pleasure.* A repeal of the law under which a tax is levied, at any time before the tax is collected, generally puts an end to the tax, etc. We say generally, for there are some exceptions, where the tax provided *is connected with a contract as the inducement for its execution,* that the court will hold the repeal of the law

to be invalid as impairing the obligation of the contract. It is not of such taxes, constituting the consideration of contracts, that we are speaking, but of ordinary taxes authorized for the support of government, or to meet some special expenditure; and these, until collected—being mere imposts of the government, created and continuing only by the will of the legislature—have none of the elements of property which can be seized like debts by attachment or other judicial process, and subjected to the payment of creditors of the dissolved corporation. They are in no proper sense of the term assets of the corporation."

This exposition of the law by Mr. Justice Field accords with the English authorities. But it must be remembered that the power of the English parliament is, in matters of this kind, unrestricted by any constitutional limitation. With us it is quite different. The framers of the federal and state constitution understood the dangers incident to unlimited legislative power, and endeavored, by constitutional restrictions, to restrain its exercise, and to this end a prohibition upon the states from passing laws impairing the obligation of contracts was inserted in the first, and ample provision made in the last for the protection of vested rights of individuals against legislative encroachments. Under the state constitution, municipal corporations may be modified or repealed; but, to prevent any possible invasion of private rights, it is further declared that no such modifications or repeal shall divest vested rights. Now these important constitutional guaranties have been frequent subjects of discussion before the courts, where they have been generally sustained and enforced. A reference to a few of these will suffice for present purposes.

"The laws," say the supreme court of the United States in *Von Hoffman* v. *City of Quincy*, 4 Wall. 535, "which subsist at the time and place of the making of the contract, and where it is to be performed," in so far as "they affect its validity, construction, discharge, and enforcement," "enter into and form a part of it, as if they were expressly referred to and incorporated in its terms." And, applying the principle

announced, the court held in that case that where a statute authorized a municipal corporation to issue bonds, and exercise the power of local taxation in order to pay them, and persons have bought and paid for such bonds in good faith, *the power of taxation thus conferred is a contract* within the meaning of the constitution, and cannot be withdrawn until the contract is satisfied. This principle was somewhat enlarged, and then applied in *Memphis* v. *United States*, 97 U. S. 293.

In *Webster* v. *Rose*, 6 Heisk. 93, the supreme court of Tennessee held that the remedy existing at the time a contract is entered into is a vested right, which cannot be taken away unless some other efficient remedy is provided. "The legislature," say the court, "have complete control over the form of the remedy, the mode of proceeding by which the legal obligation is enforced, and in all that pertains to this may alter, change, or modify its laws as discretion may dictate;" but that "in no case can it, by direct enactment for that purpose, nor even by indirection, where such is the purpose, render the remedy essentially less effective for the enforcement of the obligation to which the party had bound himself by his agreement."

The remedy then provided by law, and existing for the enforcement of contracts at the time they are executed, and in the place where they are to be performed, or some other remedy equally as efficacious or nearly so, is an essential element of the obligation which the constitution protects against impairment; and any statute enacted to essentially impair, weaken, or render the remedy less effective is in conflict with the constitution, and therefore void.

Have these principles any application to this case? Memphis was, before its extinction, a municipal corporation, chartered at the instance and for the convenient and better government of its inhabitants. It was invested with the authority to contract debts. It owned no property, and was neither authorized nor expected to acquire any, except such as it might purchase for public uses, and which, on account of its character, as well as by statute, would be exempt from exe-

cution and sale for the satisfaction of debts. Its only resources for the payment of debts consisted in its authority to levy and collect taxes for corporate purposes, including the payment of its valid obligations. It was this feature of its charter that gave it credit, without which this litigation would never have arisen, simply because there would have been no debts to sue for. The power of taxation was, as it was adjudged in Von Hoffman's case, a contract on which creditors had a right to rely. It was in virtue of this power that the officers of the city, selected by the corporation, were able to contract the obligations sued on for the benefit of the city. The funds thus realized have been presumably expended for the benefit of the city. But if unwisely invested or misapplied, as has been suggested, the loss resulting therefrom ought, in morals as well as in law, to be borne by the corporation who selected the incompetent or faithless agents, and not by the creditors who had no participation in their selection, and no power whatever to control their action. The creditors gave credit relying on the legal and familiar remedies whereby they could, in the event it became necessary, compel the city to execute the power of local taxation, and assess, levy, collect, and apply the taxes realized to the payment of their debts. These remedies, as we have shown by references to adjudications of the national and state supreme courts, were an inherent part of their obligations, and clothed them with a vested right that could not be constitutionally divested without their consent. Nevertheless, the legislature did pass the several acts enumerated. By them the city charter was repealed, and another municipality, including the same territory and population, was organized to supply its place, and the $2,500,000 of unpaid taxes claimed by complainants, or as much thereof as is owing, transferred to the state. This transfer is professedly made to the state for the benefit of creditors. But it is manifest, upon the face of the several acts under consideration, that they were enacted for the purpose and with the intent to put the city in a condition to repudiate its valid indebtedness by abrogating every remedy previously provided for the enforcement of the con-

tracts on which said indebtedness rests. The intent is too obvious for controversy. Indeed, they not only manifest a clear intent to embarrass creditors by taking from them their remedies, but they evince unusual adroitness and skill to insure the result contemplated. If the legislature, as heretofore stated, had simply withdrawn the power of taxation contained in its charter, leaving the corporation intact, this court could, upon the authority of *Memphis* v. *U. S.* and *Von Hoffman* v. *City of Quincy, supra,* have lawfully ignored said enactments, and have compelled the proper officers of the city to have levied, assessed, and collected taxes sufficient to liquidate complainants' debts; or, if the new corporation—the taxing district—had been invested with authority to levy and collect taxes, etc., the courts could compel it to do what its predecessor ought to have done, to-wit: to levy, collect, and apply the taxes realized to the payment of complainants' demands. *Broughton* v. *Pensacola,* 93 U. S. 266; and *Mount Pleasant* v. *Beekwith,* 100 U. S. 514.

But the draughtsman of these statutes skillfuly evaded these adjudications—*First,* by extinguishing the old municipality and resolving its inhabitants back into the body of the state; *secondly,* creating another and different corporation to take its place, and withholding from it the power of taxation; *thirdly,* providing that the taxes for the support of this substituted municipality should be levied directly by the general assembly and paid into the state treasury, leaving no one on whom judicial authority can be exerted in favor of creditors. But these statutes are none the less invalid because they have been so framed as to elude the power of the courts. Although prohibited by the constitution from passing laws impairing the obligation of contracts, or divesting vested rights without compensation, the prohibition may be, in some instances, as in this, successfully evaded. The constitution of the state declares that courts shall be always open for the redress of wrongs. This constitutional provision is imperative on every legislator who takes an oath to support that instrument. Yet if the legislators were, notwithstanding their oaths, to pass an act abrogating the courts, the law would be

unconstitutional, but the redress whereby the unconstitutional enactment could be avoided is not so clear. So, in this case, the acts repealing the acts constituting the charter of the city of Memphis, without saving the rights of creditors by some remedy not essentially less effective than those existing at the time its debs were contracted, was a flagrant invasion of the constitutional rights of complainants. But, as in the case supposed above, it is a wrong which the courts, according to established principles, cannot fully redress. The courts cannot levy a tax, nor can the court compel any one else to perform this duty; not, however, because the statutes forbid the exercise of such a power, but because there is no one on whom the court can act. But the obligations, moral and legal, to pay complainants' debts remain in full force. The only difficulty in their way is the want of a remedy. To this extent, then, the remedy has been wrongfully taken away, and there is no power in this court to supply another. But a partial remedy, I think, is left. There is a fund existing in the shape of debts due from the property holders who resided within the limits of the extinguished municipality, for taxes duly assessed and not paid, which constitute assets that a court of equity can gather in and apply to the payment of its debts. It was on this exact point that the judges of the appellate court disagreed, the majority insisting that these taxes "can be altered, postponed, or released at the pleasure" of the legislature. This declaration makes it so in this case; but it is in conflict with all my preconceived opinions of the law as heretofore expounded by that tribunal.

The delinquent taxes in question were assessed through a series of 10 years next before the commencement of this suit. The levies were made to obtain funds to meet the current expenses of the city government and pay its debts. A part of the tax debtors promptly met the exactions made upon them, while others failed to pay. With the funds realized the expenses of the city government were paid, leaving the taxes unpaid to be applied to the payment of debts. The levies, in some instances, were especially made for specific purposes, such as for the payment of interest as it accrued

on bonds.   But as said taxes were all levied for the purpose
of paying current expenses and debts, and as the expenses of
the city government have been liquidated, it may, I think, be
assumed that the taxes remaining unpaid were levied for cred-
itors.   They were so levied under the power of local taxation
conferred by its charter on said city, which power of taxation
was a contract, and the inducement for the credit given by
complainants to the city, and by reason of the premises vested
equitably in the creditors.   If this is true, it seems to me that
the well-considered adjudications of the supreme court, here-
inbefore quoted, are conclusive in favor of the view I have
taken.   The authority of a court of chancery to collect
through its receiver, and administer the fund for the benefit
of the *cestuis que trust,* has been demonstrated by Mr. Jus-
tice Strong in the liberal extract which I have quoted from
his opinion.

   But, as a last resort in argument, it is said that it is not
intended to deprive the creditors of this fund; that the legis-
lature has simply provided for its collection and distribution
among creditors, which it is insisted it had the right to do.   It
is difficult to treat the argument with any degree of gravity.
The future will disclose that the remedy thus provided is but
a mockery of justice.

   If the legislature has the constutional right to "alter, post-
pone, or release" these unpaid taxes at pleasure, it possesses
the power to make any disposition of them it chooses.   A
bill has been already introduced into the present legislature
to divert a portion of the fund from the purposes to which it
was dedicated, by the repealing and subsequent acts ; and if the
principle contended for is conceded, it is not hazarding much
to say that the creditors will not be greatly benefited by the
remedy thus provided for them.   But before this legislative
remedy was provided, a day before the repealing act was
passed, this court, upon a bill regularly filed, in behalf of
Garrett & Sons, in exact compliance with the statutory rem-
edy then authorized, took cognizance of their complaint, which
impounded the fund.   Its jurisdiction was complete; and
when the acts which the supreme court held (without any

reference to the aforesaid third section of the act of 1877, the act on which complainants rested their case, as originally instituted) are constitutionally valid were passed, this court had, in virtue of this suit, jurisdiction of the cause, and therefore custody of the fund in litigation. Its jurisdiction having once attached, it could not be ousted thereof by legislative enactment. To thus interfere, says Chancellor Reese, in the case of *Fisher's Slaves* v. *Dobbs*, 6 Yerger, and take away the remedy, is to destroy the right,—a result which, in the judgment of the supreme court of Tennessee, could not be accomplished in that way.

There is still another reason why the legislature did not have the authority to "alter, postpone, or release" these unpaid taxes. The constitution of Tennessee requires that taxes shall be uniform. Now, if, in the first instance, the legislature had itself levied or authorized the city of Memphis to levy and collect taxes from that portion of its citizens who paid the levies made, and had exempted the delinquents, or if the legislature had required the former to pay in money promptly as the levies were made, and authorized the delinquents to pay from 10 to 15 per cent. of the assessment in depreciated debts, etc., as it has assumed to do by these repealing and subsequent acts, the legislation would have been admittedly in contravention of the constitution, and void; and the prompt tax payers could have protected themselves against such inequality and injustice by enjoining the collection of the taxes assessed against them. Now, can this same result be accomplished by indirection? Under the constitution of Tennessee the legislature cannot, without a gross violation of that instrument, assess a uniform tax, collect from three-fifths of those assessed, and then release the residue. If it can, the injustice and inequality which the constitution sought to prevent would result. So the legislation which is used to defeat complainants encroaches upon the vested rights of the other tax payers as well as upon the rights of creditors. If the delinquent taxes had been collected in due course of law, there would have been no apparent necessity for the efforts that have been and are now being made to

repudiate the city's debts, or do what is, in principle, no better: force a settlement under the name of a compromise, at say 25 per cent. of the whole debt.

If legislation can thus strike down municipal securities, the value of the $1,000,000,000 of county, township, city, and other municipal obligations, now outstanding, in the hands of *bona fide* holders for value, depends, not on constitutional guaranties, as the American people have heretofore supposed, but on the enactments of legislatures, to be elected in large measure by the debtor communities. Then we will realize what Judge Story's prophetic vision saw many years since, that the legislative interference in this instance, which gives immunity to Memphis, is "but the first link in a long chain of repetitions, every subsequent interference being naturally provoked by the effects of the preceding one," by which injustice will be done, and the standard of integrity lowered, to be followed by other evils, that will demoralize and plague the country.

These are my views. But a decree will be entered dismissing complainants' bills and distributing the fund in the hands of the receiver in accordance with the mandate from the supreme court.